IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 120,620
120,622

STATE OF KANSAS,
*Appellee*,

v.

STEPHEN M. BODINE,
*Appellant*.

SYLLABUS BY THE COURT

1.

To invoke standing, a party generally must show that he or she suffered a cognizable injury and must show a causal connection between the injury and the challenged conduct. Standing to bring an action is a component of subject matter jurisdiction.

2.

Aiding and abetting is not a separate crime in Kansas; instead, it extends criminal liability to a person other than the principal actor.

3.

Giving assistance or encouragement to one who it is known will thereby engage in conduct dangerous to life is sufficient for accomplice liability as an aider or abettor as to crimes defined in terms of recklessness or negligence.

1

4.

Disclosure of an affidavit or sworn testimony in support of probable cause under the provisions of K.S.A. 2020 Supp. 22-2302(c) is not automatic; instead, the statute sets forth a procedure where, in response to a request, the parties may submit proposed redactions or move to seal the affidavits or sworn testimony. Nothing in the statute prevents a court from considering a defendant's constitutional rights in determining whether to redact or seal affidavits or sworn testimony.

5.

To determine prosecutorial error, an appellate court decides whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial. If it finds error, the appellate court determines if that error prejudiced the defendant's right to a fair trial.

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed May 7, 2021. Affirmed in part and dismissed in part.

*James M. Latta*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: Following the death of his girlfriend's three-year-old son, Stephen M. Bodine was convicted of first-degree felony murder, aggravated kidnapping, abuse of a child, aggravated endangering a child, aggravated assault, and criminal

damage to property. Bodine appeals his convictions, raising several constitutional arguments and multiple trial errors. Based on the analysis set forth below, we affirm Bodine's convictions and dismiss in part.

FACTS

E.B. was born in March 2014. At the time of his birth, E.B.'s mother, M.M., and his father, C.B. (Father), were no longer in a relationship. Father had little contact with E.B. during the first two years of his life but started spending more time with him in late 2016 and early 2017.

M.M. started dating Bodine in October 2016. Soon after, Bodine moved into the Wichita home M.M. shared with E.B. In February 2017, Father began seeing changes in E.B.'s behavior. Father noticed E.B.'s speech and potty training regressed after he spent time at M.M.'s house, and E.B. choked and hit Father's other son. Father also observed bruises on E.B.'s body and wondered whether he was being abused at M.M.'s house. After Father advised M.M. of his concerns, she responded in a text message that he could not see E.B. again until she and Bodine decided otherwise. M.M. also told Father to stop contacting her and that she would be changing E.B.'s last name. Father tried to arrange visitation with E.B. by exchanging several text messages with Bodine in February and March 2017, but his efforts were unsuccessful.

After further communication with M.M. and Bodine failed, Father involved the court system, social services, and law enforcement in attempts to see E.B. and check on his welfare. M.M. and Bodine stopped attending court appearances and did not respond to welfare checks. Father, along with his family and friends, often sat outside M.M.'s house, hoping to see E.B. Father also reached out to M.M.'s neighbors and acquaintances to ask if anyone had seen M.M. or E.B. Father did see E.B. briefly on two occasions. In March

2017, Father and a co-worker went to M.M.'s house. When M.M. answered the door, Father saw E.B. and observed a gash between his eyes that ran to the tip of his nose. M.M. claimed the injury was from a fall. Father reported the incident to law enforcement, who were unable to contact anyone at the residence. Sometime in April 2017, Father drove by M.M.'s house and saw her and E.B. outside. Father pulled into the driveway to talk to E.B. and noticed he looked dirty and "smelled horrible." E.B. got into Father's car and asked to go to home with him. M.M. refused but said E.B. could go to Father's house the next day. Father tried to contact M.M. then, but she did not respond to his message. Father never saw E.B. alive again after this brief interaction in April 2017.

In July 2017, Father obtained a district court order granting him custody of E.B. But Father's continued efforts to gain access to E.B. were futile. Neighbors reported they had not seen M.M. or E.B. in a month or more. After learning that M.M. and E.B. might be in Oklahoma or Texas, law enforcement initiated a missing child investigation.

In August 2017, Father and his wife drove by M.M.'s house to look for E.B. Bodine came outside with a hatchet raised above his head and told Father to leave. Bodine then used the hatchet to deflate a tire on Father's vehicle. Father reported the incident to law enforcement, who issued a warrant for Bodine's arrest. Around this same time, the State charged M.M. with interference with parental custody. On August 30, 2017, law enforcement arrested Bodine and M.M. on these charges.

Although law enforcement conducted multiple searches of M.M.'s house in the two days after the arrests, E.B. was nowhere to be found. Three days later, on September 2, M.M.'s landlord contacted law enforcement after discovering a concrete structure that looked like "a little coffin" inside the laundry room. After chipping off a corner of the concrete structure, the landlord immediately smelled an odor leading him to believe E.B. was inside. Law enforcement discovered E.B.'s body inside the concrete structure. He

4

was wrapped in several layers of bedding, towels, clothing, and duct tape. The medical examiner observed possible signs of blunt force injury to E.B.'s head, eye, and ear. Due to the decomposition of E.B.'s body, however, the medical examiner was unable to determine a cause, manner, or time of death.

The State charged Bodine in case No. 17 CR 2630 with aggravated assault and criminal damage to property for threatening Father and damaging his vehicle with the hatchet. In case No. 17 CR 3476, the State charged Bodine with two alternative counts of felony murder, two alternative counts of aggravated kidnapping, and one count each of abuse of a child (child abuse) and aggravated endangering a child (aggravated child endangerment). To support the felony-murder charges, the State alleged Bodine killed E.B. while committing the inherently dangerous felonies of child abuse and/or aggravated child endangerment. The district court consolidated the two cases for trial.

The State proceeded under an aiding and abetting theory at trial, alleging that Bodine and M.M. shared responsibility for E.B.'s death. M.M. agreed to testify as a witness for the State in exchange for her plea to reduced charges of second-degree murder, aggravated kidnapping, child abuse, and aggravated endangerment of a child. M.M. testified that within weeks of dating Bodine, he began physically abusing her regularly. According to M.M., Bodine used methamphetamine and other drugs daily, and he became more agitated and violent when he used drugs. M.M. said she became pregnant with Bodine's child but miscarried in January or February 2017. She believed the miscarriage was caused by Bodine dragging her through the house and punching her in the stomach. M.M. said she stayed with Bodine because he was her best friend and she considered him to be her husband.

M.M. testified E.B. was a well-behaved child, but Bodine disagreed and felt that E.B. whined too much and that M.M. allowed him to do whatever he wanted. M.M. said

5

Bodine was not violent with E.B. initially, but Bodine's attitude toward E.B. changed sometime in March 2017. Bodine acted as though E.B. could do nothing right and told M.M. that E.B.'s behavior was not going to change unless a male figure was in complete control. M.M. allowed Bodine to set the house rules and agreed he could discipline E.B. E.B. had to "earn" everything, including clothes, food, and toys. Bodine's discipline involved sending E.B. to his room to stand with his arms behind his back for hours at a time. If E.B. moved at all, Bodine would hit him. If E.B. did not apologize, Bodine would punch, kick, or throw E.B. across the room or slam E.B.'s head into the wall.

M.M. also testified about Bodine's controlling behavior. He did not allow E.B. to go anywhere, and M.M. stopped communicating with anyone else to avoid conflict with Bodine. He installed surveillance cameras inside the house to make sure E.B. was standing still when he was being disciplined. And Bodine installed outdoor cameras because he did not trust M.M. and wanted to know who was at the house when he left. Bodine's physical violence continued to escalate. M.M. said Bodine sometimes made her beat E.B. She admitted to doing so on a few occasions, claiming that she inflicted less harm than Bodine did. Once, E.B. refused to apologize to Bodine, so Bodine insisted E.B. had to be treated like a dog to learn. To that end, Bodine forced E.B. to stand in the basement for six hours while naked. Bodine told M.M. to place a belt—with a chain attached—around E.B.'s neck. The other end of the chain was attached to a round weight. M.M. claimed she loosely placed the belt around E.B.'s neck so he could breathe, knowing that Bodine would have made the belt tighter. Bodine set up a camera in the basement to make sure E.B. remained standing and did not move. M.M. said that when Bodine awoke the next morning and saw that E.B. was upstairs, fully clothed, and eating breakfast in front of the television, Bodine was furious and "beat the crap out of [E.B.]," leaving him "covered in bruises from head to toe."

6

M.M. testified E.B. died sometime between May 18 and May 22, 2017. She was unsure of the exact date, claiming her memories were clouded by her own drug use at the time. M.M. advised that in the two or three days just before his death, E.B. was vomiting and could not keep anything down. After E.B. did not sleep one night, Bodine forced him to stand in a corner by the front door with his arms behind his back. M.M. testified E.B. stood there for a couple of hours before collapsing to the ground. Yelling at E.B. to stand, Bodine picked him up and slammed E.B.'s head into the wall. According to M.M., E.B. immediately collapsed on the floor and began screaming. M.M. said she carried E.B. into the bathroom, where he continued to scream and cry. When M.M. shouted to Bodine that something was wrong, he shoved her out of the bathroom and shut the door, leaving him alone inside with E.B. Around two to five minutes later, Bodine came out of the bathroom and M.M. observed E.B.'s head was wet, his body was lifeless, and he was not breathing. M.M. claimed she attempted CPR for 45 minutes but was unable to revive him. M.M. said Bodine told her not to call anyone for help. M.M. testified that she fell asleep holding E.B. but that his body was gone when she woke up. Bodine told her he had called some friends to take E.B. because they could no longer take care of him. M.M. believed E.B. was in the basement, but she claimed she never saw his body again. M.M. acknowledged she shared responsibility for E.B.'s death because she failed to protect him.

M.M. testified that a couple of days after E.B. died, Bodine built the concrete tomb in the laundry room. M.M. admitted she bought the materials at Bodine's direction but denied helping him build it. After E.B.'s death, M.M. said she hid under the stairs in the basement when anyone came to the house looking for her. Bodine advised her to tell people that she had moved to Texas or Oklahoma and that E.B. had been adopted.

The State admitted into evidence numerous photographs and videos from the surveillance cameras, many of which showed E.B. being punished or abused. The State

also presented testimony from several witnesses who testified about Bodine's history of abusing former girlfriends and other children, including his own daughters.

The jury returned guilty verdicts on all charges in both cases. The district court did not enter convictions for the two counts in case No. 17 CR 3476 that were charged in the alternative: (1) felony murder with the underlying felony of child abuse as charged in count 1 and (2) aggravated kidnapping with the intent to facilitate the crime of interference with parental custody as charged in count 5. The court imposed a controlling prison sentence of 1,277 months and ordered it to run consecutive to his 31-month prison sentence and 6-month jail sentence in case No. 17 CR 2630. Bodine filed this timely appeal.

ANALYSIS

Bodine raises the following eight issues on appeal: (1) K.S.A. 2020 Supp. 21-5408(a)(3), the subsection of the kidnapping statute he was convicted under, is unconstitutionally overbroad; (2) the district court erred in instructing the jury on aggravated kidnapping; (3) the district court erred in instructing the jury on aiding and abetting; (4) K.S.A. 2020 Supp. 21-5210, the aiding and abetting statute, is unconstitutional; (5) his convictions for felony murder and aggravated child endangerment under an aiding and abetting theory are logically impossible; (6) K.S.A. 2020 Supp. 22-2302(c), the statute allowing public access to affidavits or sworn testimony filed in support of a warrant or summons, violates a defendant's constitutional right to an impartial jury; (7) the State committed prosecutorial error during argument to the jury; and (8) the cumulative effect of these alleged errors deprived him of his constitutional right to a fair trial. We address each of Bodine's issues in turn.

8

1. *Constitutionality of kidnapping statute*

For the first time on appeal, Bodine argues that K.S.A. 2020 Supp. 21-5408(a)(3)—the subsection of the kidnapping statute under which he was convicted in count 6—is unconstitutionally overbroad because it infringes on parents' rights to reasonably discipline their children. Bodine seeks reversal of his conviction and asks us to invalidate subsection (a)(3) of the statute to the extent that it criminalizes constitutionally protected parental control over a child. In response, the State argues that Bodine lacks standing to challenge the constitutionality of the statute and that his claim otherwise fails on the merits.

Before we address the merits of Bodine's arguments, we first must consider the State's standing argument. Notably, Bodine does not claim the criminal conduct forming the basis for his conviction is constitutionally protected. Instead, Bodine argues the statute is unconstitutionally overbroad on its face because other conceivable factual scenarios might impact hypothetical defendants.

Standing to bring an action is a component of subject matter jurisdiction. The question of standing is one of law over which we have unlimited review. *State v. Gilbert*, 292 Kan. 428, 431-32, 254 P.3d 1271 (2011). Generally, to invoke standing, a party must show that he or she suffered a cognizable injury and show a causal connection between the injury and the challenged conduct. *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). "'[I]f there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.'" *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014) (quoting *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 [1979]). Given Bodine raises the issue only on behalf of hypothetical third parties, he does not have standing to challenge K.S.A. 2020 Supp. 21-

9

5408(a)(3) as unconstitutionally overbroad. See *Williams*, 299 Kan. at 918. Accordingly, this claim of error is dismissed for lack of subject matter jurisdiction.

## 2. *Aggravated kidnapping instruction*

Bodine claims Instruction No. 15, the jury instruction on aggravated kidnapping with intent to facilitate a crime (interference with parental custody), was defective because it failed to include an essential element of that underlying crime.

> "When analyzing jury instruction issues, we follow a three-step process:
>
> '(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

The first and third step are interrelated: the standard of review for reversibility at the third step depends on whether a party has preserved the jury instruction challenge in the first step. 307 Kan. at 317; see K.S.A. 2020 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). At the second step, we consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931-32, 376 P.3d 70 (2016). To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

10

The instruction at issue here is preserved for our review—albeit under the less favorable clear error standard because Bodine admits he did not lodge an objection to the instruction as given. *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013).

Bodine asks us to hold jury instruction No. 15 was not legally appropriate. Instruction No. 15 sets forth the elements of aggravated kidnapping to facilitate the commission of interference with parental custody. Significant to Bodine's claim of error, Instruction No. 15 also set forth the elements of the interference with parental custody crime:

"1. [E.B.] was a child less than 16 years old.
"2. The defendant or another for whose conduct he is criminally responsible took the child away.
"3. The defendant or another for whose conduct he is criminally responsible did so with the intent to detain or conceal the child from [Father], its parent.
"4. This act occurred on or between the 1st day of March, 2017, and the 1st day of September, 2017."

Notably, Instruction No. 15 follows PIK Crim. 4th 54.230, the pattern instruction, which provides in relevant part:

"To establish this charge [of interference with parental custody], each of the following claims must be proved:
    1. *Insert name of child* was a child less than 16 years old.
    2. The defendant (took) (enticed) the child away.
    3. The defendant did so with the intent to detain or conceal the child from *insert name*, (its parent) (its guardian) (the person) having lawful charge of the child." PIK Crim. 4th 54.230.

11

Bodine argues Instruction No. 15 is legally inappropriate because it fails to include the "having lawful charge of the child" language provided in PIK Crim. 4th 54.230, which he claims is an essential element of criminal interference with parental custody. Based on the specific facts of this case, however, we are not persuaded that "having lawful charge of the child" is an essential element of the crime here. K.S.A. 2020 Supp. 21-5409(a) defines interference with parental custody as "taking or enticing away any child under the age of 16 years with the intent to detain or conceal such child from the child's parent, guardian or other person having the lawful charge of such child." The statute makes it a crime to interfere with the custody of a child's (1) parent, (2) guardian, or (3) other person having the lawful charge of the child. Where, as here, the evidence presented by the State established Father was E.B.'s parent, the State was not required to establish the third statutory alternative:  that Father was a person having the lawful charge of E.B. Given the facts presented at trial, Instruction No. 15 is legally appropriate, and the district court did not err in providing it to the jury.

3.  *Aiding and abetting instruction*

Bodine seeks reversal of his felony-murder conviction on grounds that the district court provided a legally infirm aiding and abetting jury instruction in Instruction No. 9. He claims that the instruction misstated the law and, as a result, improperly (1) allowed the State to circumvent a felony-murder requirement that the killing occur during the commission of the underlying felony and (2) added a requirement to felony murder that the death be reasonably foreseeable.

We review Bodine's challenge to the aiding and abetting jury instruction using the same three-step process outlined above. Bodine concedes he did not object to Instruction No. 9 so we review his challenge for clear error. Moving on to the second step of the analysis, we must determine whether the instruction was legally and factually

12

appropriate. See *McLinn*, 307 Kan. at 317. Bodine's argument focuses on the legal appropriateness of Instruction No. 9. "[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). On review, we consider all the instructions together without isolating any one instruction. *State v. Dupree*, 304 Kan. 377, 394, 373 P.3d 811 (2016).

Before analyzing Bodine's challenge to the aiding and abetting language in Instruction No. 9, we find it helpful to provide some necessary context. The State charged Bodine with felony murder in the killing of E.B. Felony murder is the killing of a human being committed "in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2020 Supp. 21-5402(a)(2). The State charged Bodine with the killing under two alternative theories of felony murder: (1) while in the commission of child abuse and (2) while in the commission of aggravated child endangerment. Relevant to the challenge presented by Bodine, the district court provided the jury with the following instructions, which we have summarized for simplicity:

> *Instruction 11 (murder in the first degree)*: The State must prove that Bodine—or another for whose conduct he was criminally responsible—killed E.B. and that the killing was done while Bodine—or another for whose conduct he was criminally responsible— was committing the crime of child abuse.

> *Instruction 12 (child abuse)*: The State must prove Bodine—or another for whose conduct he was criminally responsible—knowingly tortured or cruelly beat E.B.

> *Instruction 13 (murder in the first degree)*: The State must prove that Bodine—or another for whose conduct he was criminally responsible—killed E.B. while Bodine—or another for whose conduct he was criminally responsible—was committing the crime of aggravated child endangerment.

13

*Instruction 14 (aggravated child endangerment)*:  The State must prove that Bodine—or another for whose conduct he was criminally responsible—caused or permitted E.B. to be placed in a situation in which E.B.'s life, body, or health was endangered.

At the State's request, and without objection from Bodine, the court also provided Instruction No. 9 on aiding and abetting:

"The following applies to instructions number 12 and 14.

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises or counsels another to commit the crime.

"The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

Instruction No. 9 is almost identical to PIK Crim. 4th 52.140, Responsibility for Crimes of Another—Intended and Not Intended. The first paragraph of this instruction outlines when a defendant can be held responsible for crimes of another that the defendant also intended. This is the aiding and abetting same mental culpability instruction. The second paragraph of this instruction outlines when a defendant can be held responsible for crimes of another that the defendant did not intend. The second paragraph is the aiding and abetting foreseeability instruction.

14

Bodine argues the language in Instruction No. 9 is legally inappropriate when used in a felony-murder case because it misstates the law in two ways. First, he objects to the language in the same mental culpability part of the instruction that provides a person is criminally responsible for a crime if the person either "before or during its commission," intentionally aids another to commit the crime. Second, he argues it was legally inappropriate to use the "foreseeability" part of the instruction under the facts of this case. We address each of Bodine's arguments in turn.

*Same mental culpability instruction:  before or during commission of a felony*

Bodine contends that the "before or during its commission" language in Instruction No. 9 conflicts with the felony-murder statute, which requires a defendant to participate "in the commission of" the underlying felony. See K.S.A. 2020 Supp. 21-5402(a)(2). Bodine claims this conflict allowed the State to circumvent an element of felony murder because the jury could convict him of felony murder based on a finding that he aided or abetted the predicate felony *before* it was committed.

Bodine's argument is based on a faulty legal premise; specifically, that Instruction No. 9 (liability for aiding and abetting) applied to Instructions 11 and 13 (the felony murder charges), which they do not. To the contrary, Instruction No. 9 expressly states that it applies *only* to Instruction No. 12 (child abuse) and Instruction No. 14 (aggravated child endangerment). Applying the language in Instruction No. 9 only to Instructions 12 and 14 as directed, the jury was informed that Bodine was criminally responsible for child abuse and aggravated child endangerment under an aiding and abetting theory of liability if the State proved the following elements:

15

*Child abuse*: Either before or during commission of the crime of felony child abuse, and with the mental culpability required to commit felony child abuse, Bodine intentionally aided another to commit child abuse or counseled another to commit the crime of child abuse.

*Aggravated child endangerment*: Either before or during commission of the crime of aggravated child endangerment, and with the mental culpability required to commit the crime of aggravated child endangerment, Bodine intentionally aided another to commit the crime of aggravated child endangerment or counseled another to commit the crime of aggravated child endangerment.

Bodine deems irrelevant the fact that Instruction No. 9 does not apply to the two felony-murder instructions, arguing the instructions are inextricably interconnected because there can be no felony murder in the absence of an underlying felony. But his argument is premised on a fundamental misunderstanding of the nature of felony murder. If someone dies during an inherently dangerous felony, such as child abuse or aggravated child endangerment, all the participants are equally guilty of the felony murder, regardless of who dealt the final blow that killed the victim. See *State v. Dupree*, 304 Kan. 377, 393, 373 P.3d 811 (2016) (felony murder predicated on commission of inherently dangerous felony of aggravated burglary). "In short, all participants in a felony murder are principals." 304 Kan. at 393.

Bodine's inextricably interconnected argument also fails to consider that the felony-murder instructions themselves provided the jury with an option for liability based on an aiding and abetting theory. If the evidence presented at trial suggests a person other than the defendant dealt the final blow, the district court may choose to issue a felony-murder instruction like the one given in this case, which requires the State to prove "the defendant, or another, killed the victim." PIK Crim. 4th 54.120 & Notes on Use. The district court issued the following instructions:

16

"INSTRUCTION NO. 11

"The defendant is charged with murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant *or another for whose conduct he is criminally responsible* killed [E.B.].

2. The killing was done while defendant *or another for whose conduct he is criminally responsible* was committing abuse of a child.

3. This act occurred on or between the 1st day of March, 2017, and the 1st day of September, 2017, in Sedgwick County, Kansas

"The elements of abuse of a child are listed in Instruction No. 12 (Emphases added.)


"INSTRUCTION NO. 13

"The defendant is charged with murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant *or another for whose conduct he is criminally responsible* killed [E.B.].

2. The killing was done while defendant *or another for whose conduct he is criminally responsible* was committing aggravated endangering a child.

3. This act occurred on or between the 1st day of March, 2017, and the 1st day of September, 2017, in Sedgwick County, Kansas

"The elements of aggravated endangering of a child are listed in Instruction No.14." (Emphases added.)


Providing the jury with an option for liability based on an aiding and abetting theory within the felony-murder instructions themselves does not require the court to also issue a separate and distinct aiding and abetting instruction specific to felony murder.

17

In this case, the district court instructed the jury on the elements of felony murder, which as charged required the State to prove E.B. was killed *in the commission of* child abuse or aggravated child endangerment. The felony-murder instructions referred the jury to separate instructions defining the elements of child abuse and aggravated child endangerment. Under these element instructions, the jury could have concluded Bodine was guilty of the underlying felony of child abuse or aggravated child endangerment as a principal. See *State v. Gleason,* 277 Kan. 624, 633, 88 P.3d 218 (2004) (on charge of felony murder, State's primary theory of liability was that defendant was the principal for underlying felony and alternative theory was that defendant was liable for underlying felony as an aider or abettor). But in giving Instruction No. 9 and making it applicable to the element instructions for child abuse and aggravated child endangerment, the district court also allowed the jury to consider whether Bodine, either before or during the child abuse or aggravated child endangerment, aided and abetted the commission of child abuse or aggravated child endangerment. So the jury could have convicted Bodine as a principal for felony murder regardless of whether it found Bodine acted as a principal or as an aider and abettor to the crime of child abuse or aggravated child endangerment so long as it also found E.B. was killed *in the commission of* child abuse or aggravated child endangerment.

In sum, we find the "either before or during its commission" language provided in Instruction No. 9 (aiding and abetting) was legally appropriate in this case. The jury was instructed to apply the aiding and abetting elements in Instruction No. 9 only to Instruction No. 12 (child abuse) and Instruction No. 14 (aggravated child endangerment). Meanwhile, the felony-murder instructions directed the jury that it could find Bodine liable for felony murder under an accomplice theory—regardless of whether a person other than Bodine dealt the final blow—if the State proved (1) Bodine, or another, killed E.B. and (2) the killing was done while Bodine, or another, *was committing* child abuse or aggravated child endangerment.

18

*Foreseeability*

The second paragraph of Instruction No. 9 informed the jury that a person is responsible for any other crime committed in carrying out the intended crime if the person could "reasonably foresee the other crime as a probable consequence" of committing the intended crime. The Notes on Use for PIK Crim. 4th 52.140 state that the foreseeability language "should not be used for a specific-intent crime for which defendant is charged on an aiding and abetting theory" and should be used only when considering whether the defendant is guilty of a general intent crime. See *State v. Overstreet*, 288 Kan. 1, 10-12, 200 P.3d 427 (2009) (holding it is improper to give instruction on reasonably foreseeable crimes in premeditated first-degree murder case); *State v. Engelhardt*, 280 Kan. 113, 132-33, 119 P.3d 1148 (2005) (same). Child abuse and aggravated child endangerment are not specific intent crimes. See *State v. Bruce*, 255 Kan. 388, 394-95, 874 P.2d 1165 (1994) (child abuse is not a specific intent crime; intent to injure is not required); *State v. Cummings*, 45 Kan. App. 2d 15, 19, 243 P.3d 697 (2010) (child endangerment is a general intent crime), *rev'd on other grounds* 297 Kan. 716, 305 P.3d 556 (2013).

As discussed above, Instruction No. 9 expressly stated that it only should be applied to the non-specific intent crimes in Instruction No. 12 (child abuse) and Instruction No. 14 (aggravated child endangerment). So it appears the foreseeability part of the instruction is legally appropriate. But Bodine disagrees, arguing the foreseeability language is always improper in a felony-murder case because the elements of felony murder do not require the State to prove that the killing was reasonably foreseeable. In support of his claim, Bodine summarily cites to *State v. Gonzalez*, 311 Kan. 281, 293, 460 P.3d 348 (2020), and *Gleason*, 277 Kan. at 636-38.

In *Gonzalez*, a passenger in a car driven by Gonzalez shot and killed a man outside a bar. Gonzalez was charged with first-degree premeditated murder, an alternative charge of first-degree felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. The jury was instructed on all four of these crimes, as well as the lesser included offense of second-degree intentional murder. Without objection, the district court provided the foreseeability part of the aiding and abetting instruction to the jury. On review, Gonzalez challenged the foreseeability instruction on grounds that it improperly lowered the State's burden of proof on the specific intent crimes with which he was charged: first-degree premeditated murder, the lesser offense of second-degree premeditated murder, and attempted robbery. We agreed, holding that although the district court's instruction accurately reflected Kansas' aiding and abetting statute, it did not accurately incorporate applicable caselaw limiting the statute's use when defendants are charged with aiding and abetting specific intent crimes. We ultimately held that when a defendant is charged as an aider and abettor with *specific intent crimes*, it is error to instruct the jury that (1) the defendant is liable for the crime the defendant intended to aid and (2) the defendant also is "responsible for any other crime committed in carrying out . . . the intended crime if the person could reasonably foresee the other crime as a probable consequence." 311 Kan. at 290. We concluded that such an instruction negates the mental state element of specific intent crimes. 311 Kan. at 292-93.

It is only after we set forth this legal holding that we discussed the possible application of the foreseeability instruction to the charge of felony murder. We did so to address the State's argument that giving this part of the instruction was not error because the jury reasonably could have associated the foreseeability requirement with the "unintended" crimes: conspiracy to commit aggravated robbery and felony murder. First, we noted the State's argument went to the harmlessness of the error and not to the legal appropriateness of the foreseeable instruction. Regarding Gonzalez' claim that the jury could have applied the foreseeability instruction to the non-specific intent crime of felony

20

murder, we went on to say that "even if the foreseeable instruction could be viewed as limited only to felony murder, it still misstated the law because elements of felony murder do not require a jury to find the killing was reasonably foreseeable." 311 Kan. at 293. In support of this statement, we cited to *Gleason*, in which we held that "the foreseeability requirement is established as a matter of law . . . for a murder conviction based upon aiding and abetting an inherently dangerous felony . . . ." 277 Kan. at 638.

Bodine's entire argument here is based on the isolated statement we made in *Gonzalez* that a foreseeability instruction applied to a charge of felony murder is legally inappropriate because foreseeability is established as a matter of law. See 311 Kan. at 293. But unlike *Gonzalez*, there is no question here that the foreseeability instruction did not apply to the charge of felony murder; the jury expressly was instructed that it was only permitted to apply the foreseeability instruction to the non-specific intent crimes of child abuse and aggravated child endangerment facts. In sum, there is no chance that the foreseeability instruction could be viewed as applying to felony murder.

As he did in the previous section, Bodine argues that although not directly, the foreseeability instruction *indirectly* applied to the felony-murder instruction based on its application to the felonies upon which the felony-murder charges were predicated. We disagree. There simply was no foreseeability theory of aiding and abetting incorporated into the felony-murder instructions; instead, the felony-murder instructions included their own aiding and abetting elements, which limited liability to circumstances when the killing was done while Bodine—or another for whose conduct he was criminally responsible—was committing the underlying felonies, which properly conforms to the elements set forth in the felony-murder statute. See K.S.A. 2020 Supp. 21-5402(a)(2) (felony murder is the killing of a human being committed in the commission of any inherently dangerous felony).

21

Because it only applied to the element instructions on the non-specific intent crimes charged, we conclude the foreseeability language of Instruction No. 9 was legally appropriate.

### 4. *Constitutionality of aiding and abetting statute*

Bodine argues that K.S.A. 2020 Supp. 21-5210, the aiding and abetting statute, is facially unconstitutional. He claims that the statute violates due process because it eliminates the State's burden to prove every element of a charged crime by allowing for a conviction even when a defendant did not personally commit the crime.

Bodine acknowledges that he did not challenge the constitutionality of K.S.A. 2020 Supp. 21-5210 below but asks us to reach the merits of the issue under the first and second exceptions to the general rule that constitutional grounds for reversal may not be raised for the first time on appeal. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (constitutional grounds for reversal asserted for first time on appeal are not properly before appellate court for review); *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020) (listing exceptions to general rule that new legal theory may not be raised for first time on appeal). Bodine asserts that (1) his facial challenge to the statute involves a pure question of law that is finally determinative of any issues associated with his aiding and abetting convictions and (2) consideration of the issue is necessary to prevent a denial of fundamental due process rights. Under the first exception, we question whether resolution of this issue would be finally determinative of any issues related to Bodine's aiding and abetting convictions. The State presented strong evidence of Bodine's participation in the crimes of conviction as a principal and not as a mere aider and abettor. But because this issue involves a fundamental right, we will address Bodine's constitutional argument under the second exception. See *State v. McBride*, 307 Kan. 60,

22

69, 405 P.3d 1196 (2017) (right to a fair trial is a fundamental liberty secured by the Due Process Clause).

The determination of whether a statute is constitutional is a question of law subject to unlimited review. See *State v. Gonzalez* 307 Kan. 575, 579, 412 P.3d 968 (2018). Bodine bears the burden to establish the statute is unconstitutional. See *Williams*, 299 Kan. at 920.

K.S.A. 2020 Supp. 21-5210(a) states: "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime."

Bodine alleges that to obtain a lawful conviction in a criminal case, it is understood that the State is required to prove "personal perpetration"—that the defendant committed each charged crime. He claims that the aiding and abetting statute relieves the State of its burden to prove an essential element of Kansas criminal statutes—that the defendant committed the crimes beyond a reasonable doubt—and allows for a conviction without proof that the defendant personally committed the charged crimes.

Again, Bodine's argument reflects a basic misunderstanding of the theory of aiding and abetting. "[A]iding and abetting is not a separate crime in Kansas. Instead, it extends criminal liability to a person other than the principal actor." *State v. Robinson*, 293 Kan. 1002, 1037-38, 270 P.3d 1183 (2012) (under shared accomplice liability, all persons involved are equally responsible for all the actions of others). The United States Court of Appeals for the Tenth Circuit similarly has interpreted the federal aiding and abetting statute, 18 U.S.C. § 2 (2018). See *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1996). The State need not charge aiding and abetting to pursue the theory at trial. It is

23

appropriate to instruct the jury on aiding and abetting if at trial the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime. *State v. Betancourt*, 299 Kan. 131, 140, 322 P.3d 353 (2014).

Contrary to Bodine's assertion, K.S.A. 2020 Supp. 21-5210 does not relieve the State of its burden to prove every element of a charged crime because all participants who aid and abet a crime are equally guilty without regard to the extent of each's participation. See *State v. Maxwell*, 234 Kan. 393, Syl. ¶ 6, 672 P.2d 590 (1983) ("It is well settled that all participants in a crime are equally guilty without regard to the extent of their participation, and that any person who counsels, aids, or abets in the commission of an offense may be charged, tried and convicted in the same manner as though he [or she] were a principal."); see also *Betancourt*, 299 Kan. at 139 ("[T]he legislative intent, as expressed in the language of the aiding and abetting statute, is to make each individual who engages in a concerted action to carry out a crime equally culpable.") (citing *Rosemond v. United States*, 572 U.S. 67, 72-73, 134 S. Ct. 1240, 188 L. Ed. 2d 248 [2014] [under both common-law and federal statute, aiding and abetting does not have to advance every element of principal crime]); *State v. Gardner*, 10 Kan. App. 2d 408, 417, 701 P.2d 703 (1985) (proof that a specific person is the principal is not an element of aiding and abetting, nor is it essential that the identity of the principal be established) (citing *United States v. Harper*, 579 F.2d 1235, 1237-39 [10th Cir. 1978]).

In an aiding and abetting situation, the principal and the aider are engaged in the violation of a statutory crime at different levels of participation. But all participants in a crime are equally guilty without regard to the extent of their participation. Because the aiding and abetting statute does not eliminate the State's burden to prove every element of a charged crime, Bodine's due process argument necessarily fails. K.S.A. 2020 Supp. 21-5210 is not unconstitutional.

5. *Felony murder predicated on crime of aggravated child endangerment*

Bodine argues that his convictions for felony murder and aggravated child endangerment must be reversed because his convictions for these crimes were logically impossible given the differing mental culpability required for aiding and abetting and aggravated child endangerment. In response, the State contends that Bodine's argument is precluded by the doctrine of invited error and otherwise fails on the merits.

Bodine concedes he did not raise this claim before the district court but alleges our review is proper because the issue involves a pure question of law, is finally determinative, and implicates his fundamental right to have the elements of his convictions proved beyond a reasonable doubt. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014) (issues not raised before trial court cannot be raised on appeal); *Harris*, 311 Kan. at 375 (listing exceptions to general rule that new legal theory may not be raised for first time on appeal). While the issue does present a pure legal issue, we are not persuaded it is determinative of the case because even if we were to rule in Bodine's favor on this issue, his other convictions would remain. In any event, we will review Bodine's claim of error because it implicates a fundamental right. See *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Due Process Clause of the Fourteenth Amendment requires proof beyond a reasonable doubt of each element of crime charged); *State v. Craig*, 311 Kan. 456, 462, 462 P.3d 173 (2020) (same).

Before we reach the merits of Bodine's argument, however, we address the State's claim of invited error. Whether the doctrine of invited error applies is a question of law subject to unlimited review. *State v. Parks*, 308 Kan. 39, 42, 417 P.3d 1070 (2018). A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Stewart*, 306 Kan. 237, 248, 393 P.3d 1031 (2017); see *State v. Smith*, 232 Kan. 128, Syl. ¶ 2, 652 P.2d 703 (1982) ("Where a party procures a

court to proceed in a particular way and invites a particular ruling, he [or she] is precluded from assailing such proceeding and ruling on appellate review."). The State contends Bodine invited any error on this issue by expressly advocating for the aiding and abetting instruction to apply to the aggravated child endangerment charge.

In response, Bodine suggests that the State's framing of the issue as an instructional error is improper and asserts that the invited error rule does not apply because he is not challenging the legitimacy of the instructions. Bodine argues that even if he did invite the instructional error, it is irrelevant because a conviction for a nonexistent crime cannot be upheld. Bodine's argument is persuasive.

Whether Bodine's convictions for felony murder and aggravated child endangerment are legally impossible raises a question of law subject to unlimited appellate review. See *State v. Gutierrez*, 285 Kan. 332, 339, 172 P.3d 18 (2007) (it is the court's function to determine whether statute or combination of statutes proscribes certain conduct as criminal) (citing *State v. Sexton*, 232 Kan. 539, 542, 657 P.2d 43 [1983]). In addition, resolution of this issue will require this court to engage in statutory interpretation, which presents a question of law over which we have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). We determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. *In re Joint Application of Westar Energy and Kansas Gas and Electric Co.*, 311 Kan. 320, 328, 460 P.3d 821 (2020). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

Bodine's argument rests on the statutory language defining aggravated child endangerment and aiding and abetting. Aggravated child endangerment is defined as

26

"[r]ecklessly causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health is endangered." K.S.A. 2020 Supp. 21-5601(b)(1). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2020 Supp. 21-5202(j). Aiding and abetting is defined as being "criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 2020 Supp. 21-5210(a).

According to Bodine, his convictions for felony murder and aggravated child endangerment are invalid because it is logically impossible to advise, counsel, or intentionally aid another with the intent to further an unintentional, or reckless, crime. For support, Bodine relies primarily on *Gutierrez*, where we recognized that it is logically impossible to attempt to commit an unintentional act because attempt is a specific intent crime. 285 Kan. at 343-44. For this same reason, Bodine contends that because aiding and abetting requires specific intent, it cannot be applied to aggravated child endangerment because it is logically impossible to aid and abet a reckless act.

Contrary to Bodine's argument, we have held that "[g]iving assistance or encouragement to one who it is known will thereby engage in conduct dangerous to life is sufficient for accomplice liability as an aider or abettor as to crimes defined in terms of recklessness or negligence." *State v. Garza*, 259 Kan. 826, 834-35, 916 P.2d 9 (1996) ("individuals may act together in the commission of a crime based upon their depraved, indifferent, or reckless conduct"); see *State v. Friday*, 297 Kan. 1023, 1041-42, 306 P.3d 265 (2013) (relying on *Garza* to hold no legal error in instructing jury on aiding and abetting liability for reckless second-degree murder).

27

Bodine acknowledges our holdings in *Garza* and *Friday* but claims they are irrelevant here because the aiding and abetting statute that was in effect in those cases has since been amended. At the time of the crimes at issue in *Garza* and *Friday*, the aiding and abetting statute provided that a person "is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1); *Friday*, 297 Kan. at 1042; *Garza*, 259 Kan. at 830. The Legislature amended the aiding and abetting statute in 2010. See L. 2010, ch. 136, § 30. As discussed, the current version of the statute, which was in effect at the time of Bodine's crimes, provides that a person "is criminally responsible for a crime committed by another if such person, *acting with the mental culpability required for the commission thereof*, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." (Emphasis added.) K.S.A. 2020 Supp. 21-5210(a). Bodine suggests that because K.S.A. 2020 Supp. 21-5210(a) now expressly incorporates mental culpability, a defendant can never be convicted of aiding or abetting a reckless crime because it is impossible to "unintentionally, intentionally aid the commission of the crime."

But Bodine's reading of the statute is unreasonable. Under K.S.A. 2020 Supp. 21-5210(a), the aider must intentionally assist the principal. In doing so, the aider must possess the mental culpability required for the commission of the crime for which the aider is assisting. Aggravated child endangerment requires a reckless mental culpability. K.S.A. 2020 Supp. 21-5601(b)(1). And "individuals may act together in the commission of a crime based upon their depraved, indifferent, or reckless conduct." *Garza*, 259 Kan. at 834. Thus, it was logically possible for the jury to find that Bodine advised, counseled, or intentionally aided M.M. in recklessly causing or permitting E.B. to be placed in a situation in which his life, body, or health was endangered. See K.S.A. 2020 Supp. 21-

5601(b)(1). Bodine's argument fails. See *State v. Keel*, 302 Kan. 560, 574, 357 P.3d 251 (2015) (we must construe statutes to avoid unreasonable or absurd results).

6. *Constitutionality of public access statute*

Bodine argues that K.S.A. 2020 Supp. 22-2302(c), the statute allowing public access to affidavits or sworn testimony filed in support of a warrant or summons, is facially unconstitutional because it requires disclosure of an affidavit even when such disclosure would violate a defendant's fundamental right to an impartial jury.

*Standard of Review*

The determination of whether a statute is constitutional is a question of law subject to unlimited review. *Gonzalez*, 307 Kan. at 579. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ullery*, 304 Kan. at 409.

*Additional Factual Background*

Before trial, several media outlets requested a copy of the probable cause affidavit or sworn testimony filed in support of Bodine's arrest warrant under K.S.A. 2020 Supp. 22-2302. Bodine filed a notice of objection opposing the media requests and asked the district court to instead seal the requested information. Bodine argued, in relevant part, that release of the affidavit would cause undue prejudice and bias the potential jury pool. He also alleged that K.S.A. 2020 Supp. 22-2302 was unconstitutional because it "failed to provide any grounds for which the defendant could oppose such release" and "give[s] no

29

weight or deference to the accused's right to a fair trial." In response, the State filed a request to redact certain information from the affidavit.

The parties appeared before the district court for a hearing on the matter. After considering oral argument from counsel, the district court denied Bodine's motion to seal the affidavit. In making this ruling, the court held that Bodine's constitutional objection to release of the affidavit was conclusory and unsupported by any authority. The court also denied the State's redaction request and ordered the affidavit's release without redaction.

*Analysis*

Criminal defendants have a constitutional right to a trial by an impartial jury, guaranteed by both the Sixth Amendment to the United States Constitution and §10 of the Kansas Constitution Bill of Rights. *State v. Longoria*, 301 Kan. 489, 504-05, 343 P.3d 1128 (2015). This right often conflicts with the strong presumption in favor of open judicial proceedings and free access to records in criminal cases. See *Kansas City Star Co. v. Fossey*, 230 Kan. 240, 248, 630 P.2d 1176 (1981). This is because "adverse pretrial publicity may endanger the ability of a defendant to receive a fair trial in situations where prospective jurors read or hear the adverse publicity and are affected in their judgment should they later sit as jurors." *State v. Alston*, 256 Kan. 571, 580, 887 P.2d 681 (1994).

The right of the public to access public records for inspection is based in our common law. *Stephens v. Van Arsdale*, 227 Kan. 676, 686, 608 P.2d 972 (1980) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 [1978]). The right of access to public records generally has been held to include court records. *Nixon*, 435 U.S. at 597; *Stephens*, 227 Kan. at 686. "An affidavit in support of an arrest warrant is necessary and relevant to the performance of the judicial function and, accordingly, is a judicial record." *State v. Davis*, 48 Conn. Supp. 147, 152, 834 A.2d 805

30

(2003). But the right of public access to court documents is not absolute, and the decision whether to allow public access is usually within the sound discretion of the trial court given the facts and circumstances of the particular case. *Nixon*, 435 U.S. at 597-99; *Stephens*, 227 Kan. at 686-87. To safeguard the accused's right to a fair trial, a trial judge has an affirmative duty to minimize the effects of prejudicial pretrial publicity. Such safeguards may include closing pretrial proceedings and sealing judicial records. *Fossey*, 230 Kan. at 246-49. When considering the sealing of a record or the closure of a proceeding, a court should also consider the public's interest in open criminal proceedings and records. *Wichita Eagle Beacon v. Owens*, 271 Kan. 710, 713, 27 P.3d 881 (2001).

With these legal principles in mind, we turn to K.S.A. 2020 Supp. 22-2302, which sets forth the procedure for requesting affidavits or sworn testimony filed in support of an arrest warrant or summons. K.S.A. 2020 Supp. 22-2302(c)(1)(B) provides that after the warrant or summons has been executed, "affidavits or sworn testimony in support of the probable cause requirement of this section . . . shall be made available to . . . any person, when requested, in accordance with the requirements of this subsection." K.S.A. 2020 Supp. 22-2302(c)(2) states that "[a]ny person may request that affidavits or sworn testimony be disclosed by filing such request with the clerk of the court." Upon request, the defendant, the prosecutor, and the victim are entitled to prompt notice of the request. Within five business days following the request, the defendant and prosecutor may submit proposed redactions or move to seal the affidavits or sworn testimony. K.S.A. 2020 Supp. 22-2302 (c)(3)(A)-(B). The court must then determine whether to

"make appropriate redactions, or seal the affidavits or sworn testimony, as necessary to prevent public disclosure of information that would:

"(A) Jeopardize the physical, mental or emotional safety or well-being of a victim, witness, confidential source or undercover agent, or cause the destruction of evidence;

31

"(B) reveal information obtained from a court-ordered wiretap or from a search warrant for a tracking device that has not expired;

"(C) interfere with any prospective law enforcement action, criminal investigation or prosecution;

"(D) reveal the identity of any confidential source or undercover agent;

"(E) reveal confidential investigative techniques or procedures not known to the general public;

"(F) endanger the life or physical safety of any person;

"(G) reveal the name, address, telephone number or any other information which specifically and individually identifies the victim of any sexual offense . . . ;

"(H) reveal the name of any minor;

"(I) reveal any date of birth, personal or business telephone number, driver's license number, nondriver's identification number, social security number, employee identification number, taxpayer identification number, vehicle identification number or financial account information; or

"(J) constitute a clearly unwarranted invasion of personal privacy. As used in this subparagraph, 'clearly unwarranted invasion of personal privacy' means revealing information that would be highly offensive to a reasonable person and is totally unrelated to the alleged crime that resulted in the issuance of the arrest warrant, including information totally unrelated to the alleged crime that may pose a risk to a person or property and is not of legitimate concern to the public. The provisions of this subparagraph shall only be used to redact and shall not be used to

32

seal affidavits or sworn testimony." K.S.A. 2020 Supp. 22-2302(c)(4)(A)-(J).

Bodine claims that K.S.A. 2020 Supp. 22-2302(c) is unconstitutional because it does not give courts discretion to weigh a defendant's constitutional rights in considering whether to redact or seal affidavits or sworn testimony. Bodine alleges that if a request for an affidavit is made in accordance with K.S.A. 2020 Supp. 22-2302(c), the statute requires disclosure of sensitive records even when doing so would implicate a defendant's right to a fair trial by an impartial jury.

Bodine's argument is unpersuasive. K.S.A. 2020 Supp. 22-2302(c) does not require automatic disclosure of an affidavit or sworn testimony upon request. Instead, it sets forth a procedure where, in response to the request, the parties may submit proposed redactions or move to seal the affidavits or sworn testimony. K.S.A. 2020 Supp. 22-2302(c)(3). The parties did just that in this case and then had a chance to argue their respective positions before the district court. Nothing in the statute prevents a court from considering a defendant's constitutional rights in determining whether to redact or seal affidavits or sworn testimony. Here, the district court heard argument on Bodine's constitutional claim and ultimately denied relief after finding that it was conclusory and lacked adequate support.

We decline Bodine's invitation to read K.S.A. 2020 Supp. 22-2302(c) as somehow prohibiting a court from considering a defendant's constitutional claims in determining whether to redact or seal affidavits or sworn testimony. See *Ayers*, 309 Kan. at 164 (appellate court should refrain from reading something into plain and unambiguous statute that is not readily found in its words). That Bodine did not receive a favorable ruling from the district court based on his conclusory allegations does not render K.S.A 2020 Supp. 22-2302(c), or the process set forth therein, constitutionally infirm. The mere

33

risk of prejudice to a defendant does not automatically justify refusing public access. See *Press-Enterprise Co. v. Superior Court of Cal., County of Riverside*, 478 U.S. 1, 15, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (conclusory assertions that defendant's right to an impartial jury will be prejudiced are insufficient to overcome right of public access); *Davis*, 48 Conn. Supp. at 152 (party seeking to limit public disclosure of arrest warrant must advance overriding protected interest that is likely to be prejudiced).

Finally, we note that "'the Sixth Amendment does not demand juror ignorance[.]'" *Longoria*, 301 Kan. at 507. And information in a probable cause affidavit does not inherently create any greater risk of an unfair trial than other types of pretrial publicity. See *Commonwealth v. Fenstermaker*, 515 Pa. 501, 513, 530 A.2d 414 (1987) (discussing Sixth Amendment considerations relevant to public release of arrest warrants and noting that "in the usual case pretrial publicity does not automatically render a fair trial impossible"). Rather than prohibiting access to court records, the preferred and most effective way to assure a fair trial is through voir dire. This process allows attorneys and courts to identify those jurors whose prior knowledge of the case would prevent them from rendering an impartial verdict. See *State v. Robinson*, 306 Kan. 431, 444, 394 P.3d 868 (2017) ("The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality."). Bodine's constitutional challenge to K.S.A. 2020 Supp. 22-2302(c) is without merit.

7. *Prosecutorial error*

Bodine claims that four instances of prosecutorial error, made during the prosecutor's opening statement and closing argument, denied him a fair trial.

34

*Standard of Review and Legal Framework*

Bodine did not object to any of the prosecutor's comments. But we will review a claim of prosecutorial error based on comments made during voir dire, opening statement, or closing argument even in the absence of a contemporaneous objection. We may, however, figure the presence or absence of an objection into our analysis of the alleged error. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018).

We use a two-step process to analyze claims of prosecutorial error. First, we determine whether error occurred. Second, if there is error, we consider prejudice to determine whether the error was harmless. Under the first step, a prosecutor committed error if the act complained of fell outside the wide latitude afforded the prosecutor in conducting the State's case in a way that does not offend the defendant's constitutional right to a fair trial. *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020). If we find error, we move to a harmlessness analysis to "determine whether the error prejudiced the defendant's due process rights to a fair trial." 311 Kan. at 910. An error is harmless if the State shows "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" 311 Kan. at 910. In other words, error is harmless if "'there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 674, 414 P.3d 713 (2018).

Prosecutors have wide latitude in crafting their arguments and drawing reasonable inferences from the evidence. Even so, "[a]ny argument 'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" [Citations omitted.]" *Longoria*, 301 Kan. at 524. "In determining whether a particular statement falls outside of the wide latitude given to

prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

*Analysis*

Bodine makes four separate claims of prosecutorial error, alleging that the prosecutor: (1) misstated the evidence by referring to a belt around E.B.'s neck as a dog collar; (2) misstated the evidence by saying that "[E.B.'s] eyes were gone" when his body was found; (3) commented on facts not in evidence and appealed to the passions of the jury by stating that Bodine might as well have burned E.B.'s body; and (4) interjected personal feelings into the case by commenting on Bodine's drug use. We address each allegation in turn.

### A. Comments referencing a dog collar

The prosecutor informed the jury during opening statement that it would see video and photographic evidence of punishment that E.B. had endured in the basement: "His punishment is he has a dog collar around his throat, a chain or rope tied to an object in the corner." Then during closing argument, the prosecutor stated that "[E.B.]'s story will always be remembered with a dog collar wrapped around his neck." Later, during the rebuttal portion of closing argument, the prosecutor referred to "the leash or the belt around [E.B.]'s neck."

Bodine claims that the prosecutor misstated the evidence by referring to a dog collar around E.B.'s neck because the evidence showed that the item was a belt. But a review of the record reveals that the prosecutor's comments constituted a reasonable inference from the evidence admitted at trial. The State offered into evidence

36

photographs and video of E.B. that showed him in the basement, naked, and with his hands behind his back. There is a dark object around E.B.'s neck, but it is difficult to identify. When asked to describe the photograph, Wichita Police Sergeant Christian Cory testified that it showed E.B. in the basement and that he "appear[ed] to have some sort of restrainer around his neck." In describing a video of the incident, Cory said that E.B. was "standing there with a chain around his neck." M.M. later described the object as a belt attached to a chain. When asked to explain why she would put a "leash" around her son's neck, M.M. replied that Bodine insisted that E.B. "had to be treated like a dog in order to learn."

Given the unclear nature of the object around E.B.'s neck, the differing descriptions of the restraint, M.M.'s testimony that Bodine wanted to treat E.B. like a dog, and other witness testimony that used the terms "collar" and "leash" interchangeably, the prosecutor's references to a dog collar around E.B.'s neck constituted a reasonable inference from the evidence. Notably, defense counsel also called the object a collar during closing argument. Moreover, Bodine fails to offer any significant distinction between a belt and a dog collar. Even if the object around E.B.'s neck was a belt, it could look like a collar. And whether it was a belt or a collar makes no difference, as neither is designed nor intended to be placed around a child's neck as a form of punishment. The prosecutor's comments were not erroneous.

*B. Comments about E.B.'s eyes*

The following additional facts are necessary to place the prosecutor's comments in context. At trial, M.M. testified that Bodine once told her that if you gave someone a large quantity of salt, it would make the person sick. M.M. believed that E.B. was so sick in the days just before his death because Bodine had given him salt, though she admitted that she did not see Bodine do so.

37

Dr. Timothy Rohrig, director of the Sedgwick County Regional Forensic Science Center, testified about the toxicology testing that was performed as part of E.B.'s autopsy. The prosecutor elicited testimony from Rohrig that table salt could be used to poison someone and that ingesting large quantities of salt could result in death if left untreated. Rohrig said the only way to determine whether a person had high concentrations of sodium in his or her system is to test the person's vitreous humor, or eye fluid. Rohrig testified that it would have been impossible to test E.B.'s sodium levels because he had no eye fluid left at the time of the autopsy.

The prosecutor made these statements during closing argument:

> "[M.M.] talked about salt. Is it a thing? Who knows. The defendant tells her, hey, you know what, you want to make somebody sick, give them salt. Well, we can't test for that because *the eyes were not there*. Nobody knew about it at the time of the autopsy, but *the eyes were gone*. We wouldn't be able to test for it according to Dr. Rohrig, but think about it now." (Emphasis added.)

Bodine argues the prosecutor improperly misstated the evidence by saying that E.B.'s eyes were gone. Bodine correctly notes that Dr. Rohrig instead testified that E.B. had no eye fluid. Although acknowledging Dr. Rohrig's testimony, the State claims Bodine's argument is largely a matter of semantics. When considered in context, the State claims the prosecutor was not suggesting that Bodine actually had removed E.B.'s eyes but instead was simply reminding the jurors why it was not possible to determine whether Bodine forced E.B. to ingest salt shortly before his death as M.M. believed. Whether the prosecutor misstated the evidence here is a close call; accordingly, we will assume without deciding that the prosecutor erred.

## C. Comment about burning E.B.'s body

During closing argument, the prosecutor discussed the medical examiner's inability to determine E.B.'s cause of death: "Well, yeah, the coroner can't say the thing that killed [E.B.] because of what [Bodine] did. He destroyed the body. *He may have [sic] as well have burned [E.B.] for as much evidence that was left behind.* He buried him in the concrete." (Emphasis added.)

Bodine claims that the prosecutor's statement about burning E.B.'s body constituted a comment on facts not in evidence and appealed to the passions of the jury by emphasizing and exaggerating "just how horrific this case was."

Contrary to Bodine's claim of error, the prosecutor's statement was a fair comment on the evidence. Dr. Scott Kipper, the medical examiner who performed E.B.'s autopsy, testified about the condition of E.B.'s body upon removal from the concrete tomb. Kipper explained that the concrete affected how the body decomposed and impacted his ability to conduct a full autopsy. Kipper could not determine with any certainty whether E.B. had bruising on his body and could only state that E.B. had "possible" injuries to the top of his head, ear, and eye, which reflected some type of blunt force trauma. But Kipper did not know whether E.B. had suffered a head or brain injury because the decomposition had "basically liquifie[d]" his brain. Ultimately, Kipper was unable to determine the cause, manner, or time of E.B.'s death, mainly due to the decomposition of his body.

Given the State's inability to present medical evidence of E.B.'s cause of death—which defense counsel repeatedly emphasized during closing argument—the prosecutor was not wrong to remind the jury that Bodine bore responsibility for the decomposed state of E.B.'s body. The prosecutor did not suggest that Bodine had actually burned E.B.'s body. The comment was merely meant to explain that Bodine's actions of burying

39

E.B. in concrete had the same effect as if he had done so—they prevented the medical examiner from providing any information about how E.B. died. The prosecutor's comment was supported by the evidence, did not constitute an improper appeal to the passions of the jury, and fell within the broad discretion we afford prosecutors. See *Longoria*, 301 Kan. at 524.

*D. Comment about Bodine's drug use*

During the State's rebuttal argument, the prosecutor said,

"Do we see acts of violence? We hear it from this defendant on the tapes. Why don't we have more? They were hiding as much stuff as they could. Who set you [*sic*] up the surveillance? Who wanted to watch everything? Who was in control? Who could delete what they could delete? Maybe that's why. Maybe they didn't know there was a few things up in that Cloud that gave us answers, and *thank goodness their meth-induced paranoia was there or we would never know*." (Emphasis added.)

Bodine argues that the prosecutor's comment attributing the video evidence to Bodine's drug use improperly imparted the prosecutor's personal opinion to the jury. In doing so, he suggests that the prosecutor provided unsworn testimony by implying "how lucky we all were that Bodine smoked methamphetamine."

In general, a prosecutor may not offer a jury the prosecutor's personal opinion "because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014). But fair comment on the interpretation of evidence is allowed, and prosecutors do have some latitude to use colorful language when arguing the State's case. *Butler*, 307 Kan. at 865.

Applying these principles, we find that the prosecutor's statement linking Bodine's decision to install surveillance cameras to his drug use was a fair interpretation of the evidence. M.M. testified that Bodine used drugs daily and specifically mentioned methamphetamine as one of the drugs he used. M.M. said that Bodine was more agitated when he used drugs. M.M. also testified that Bodine installed surveillance cameras inside the house because he did not trust that E.B. would stand still while he was being punished. M.M. said that Bodine installed cameras outside the house so he could see if anyone came over when he left. The prosecutor simply inferred that Bodine's suspicions were caused by his drug use and then pointed out that the surveillance cameras ultimately led to the discovery of damaging evidence against Bodine. The prosecutor's comment did not constitute an improper personal opinion and was not outside the wide latitude afforded prosecutors during closing argument. See *Butler*, 307 Kan. at 865.

*Prejudice*

Our finding that the prosecutor committed error requires us to determine whether the error prejudiced Bodine's right to a fair trial. See *Thomas*, 311 Kan. at 910. When assessing prejudice, "'[t]he focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry.' [Citation omitted.]" *State v. Ballou*, 310 Kan. 591, 598, 448 P.3d 479 (2019). We may also consider the presence or absence of a defendant's objection in our analysis. *Butler*, 307 Kan. at 864.

The medical evidence established that E.B. did not have any eye fluid at the time of the autopsy, which prevented any testing to determine E.B.'s sodium levels. The prosecutor misstated the evidence by commenting that E.B.'s eyes were gone at the autopsy. But we must consider the context surrounding the statement rather than

41

analyzing it in isolation. *Ross*, 310 Kan. at 221. Before making this statement, the prosecutor discussed the coroner's inability to determine E.B.'s cause of death due to the decomposition of his body in the concrete tomb. The prosecutor then argued that although the cause of E.B.'s death was unknown, the evidence established that Bodine was responsible. While discussing this evidence, the prosecutor reminded the jury about M.M.'s belief that Bodine had given E.B. salt, and that it was impossible to determine whether high sodium levels had contributed to E.B.'s death due to the condition of his body.

When viewed in context, the prosecutor's erroneous comment about E.B.'s eyes was brief, isolated, and was not designed to influence the jury's deliberations. See *Longoria*, 301 Kan. at 524. The prosecutor did not at any point actually suggest that Bodine had removed E.B.'s eyes. Finally, we cannot ignore the overwhelming nature of the evidence against Bodine—most significantly, M.M.'s testimony and the photographic and video evidence that corroborated her testimony and showed E.B. being abused. A review of the entire record establishes there is no reasonable possibility that the prosecutor's single error during closing argument contributed to the verdict. See *Thomas*, 311 Kan. at 910; *Chandler*, 307 Kan. at 674. As a result, the error was harmless.

8. *Cumulative error*

For his final issue, Bodine argues that the cumulative effect of the alleged errors deprived him of his constitutional right to a fair trial. "The test for cumulative error is '"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."'" *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016). Having found only one harmless error here,

there can be no cumulative error. *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014) ("Nor may a single error constitute cumulative error.").

Affirmed in part and dismissed in part.