IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,120

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY DAVID GRABLE,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 2020 Supp. 21-6620(c)(1)(A) generally directs a district court to order a person convicted of premeditated first-degree murder to serve a sentence of life with a mandatory minimum 50-year term of imprisonment before parole eligibility. But the court may depart from that hard 50 sentence by finding substantial and compelling reasons to do so.

2.

The term "substantial" in the sentencing departure context means something that is real, not imagined, and of substance, not ephemeral. A "compelling" reason to override the general rule requiring a hard 50 sentence is one that forces a court—by the case's facts—to abandon the status quo and impose a lesser mandatory minimum term of imprisonment.

3.

When an appellate court considers whether a district court erred in granting or denying a sentencing departure based on a mitigating factor, the appellate court applies an abuse of discretion standard.

1

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed November 19, 2021. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Anthony Grable pled guilty to first-degree premeditated murder and seven other related felony offenses resulting from a violent crime spree. On appeal, he claims the district court abused its discretion when it imposed the statutory default sentence of life without the possibility of parole for 50 years. He argues his mental health issues and other mitigating circumstances combined to provide substantial and compelling reasons for a departure down to a hard 25 sentence. We hold the court did not abuse its discretion and affirm Grable's hard 50 sentence.

FACTUAL AND PROCEDURAL BACKGROUND

Grable shot and killed a coworker; shot and seriously injured another coworker; went after three other coworkers with his handgun; carjacked two unrelated people's vehicles; and entered the dwelling of a carjacking victim. The State charged him with eight felony offenses: first-degree premeditated murder, attempted first-degree premeditated murder, three counts of aggravated assault, two counts of aggravated robbery, and burglary of a dwelling. He agreed to plead guilty as charged in return for the State recommending concurrent sentences. The plea agreement allowed Grable to seek a sentencing departure and the State to request a hard 50 sentence.

2

At the plea hearing, the State presented the following facts underlying the crimes, which Grable agreed were true:

"[O]n July 3rd of 2018, at approximately 8:55 a.m., Overland Park police dispatchers began receiving calls about a shooting at 15800 Roe Avenue in Overland Park, Johnson County, Kansas. Dispatch was being advised that a shooting had occurred at the Sunrise Point Elementary School playground. At least two people were shot, one of which was believed to be dead at that time. Dispatchers were advised the suspect had left the area in a white Chevy Colorado truck. One of the calls identified the shooter as a coworker by the name of Anthony David Grable, the defendant. He was a contractor working at the elementary school playground installing new playground turf. The Chevy Colorado belonged to his employer, SYNlawn Company . . . .

"While Overland Park officers responded to Sunrise Point Elementary, dispatchers began to receive other calls for two reported aggravated robberies which happened within minutes of each other, the first being at the Green Lantern Carwash at 15061 Metcalf in Overland Park, Johnson County, Kansas. . . .

"Both robbery victims . . . provided a description of the suspect which matched the description of the shooting suspect at Sunrise Point Elementary, Anthony Grable.

"In the area of Green Lantern Carwash, Jeffrey Wilson contacted police, and he advised that he was approached by a white male at gunpoint. The man had a gun in his hand, motioned for him to get out of his car, and Mr. Wilson did so immediately out of fear that he would be harmed or shot. The man took his 1999 green Buick LeSabre . . . . That vehicle was located just a short distance north of that at CrossFit 913. It should also be noted that the white Chevy Colorado truck from SYNlawn Company was located at the Green Lantern Carwash.

"Officers also responded to CrossFit 913. At that location, Christopher Purvis reported that he saw a white male trying to break into a black Chevy parked near his own

3

GMC Yukon Denali. That same white male approached him as he was seated inside the driver's seat of his GMC Yukon. As Purvis was rolling up his window, the white male entered his GMC Yukon through the back driver's side door. The man was armed with a handgun and raised the firearm at Purvis. Purvis was afraid, immediately got out of his vehicle . . . . It should be noted that Mr. Wilson's [car] was parked right next to where Purvis had parked.

"Purvis's GMC Yukon was equipped with OnStar. His cellphone was also left inside the Yukon. Officers immediately contacted OnStar and Purvis's cellphone provider to get GPS coordinates for both the vehicle and Purvis's cellphone. Both providers showed that the cellphone and the GMC Yukon were in the area of Purvis's residence at 5205 West 160th Street in Overland Park, Johnson County, Kansas. Officers were dispatched to that address. When they pulled down the street and in front of that, Purvis's black GMC Yukon was there but nobody was inside the vehicle.

. . . .

"Tactical officers began approaching the residence with a large tactical vehicle. As they were doing so, Grable was seen by tactical officers attempting to flee out of the back of the residence. He was apprehended at gunpoint. It was readily apparent that Mr. Grable had changed clothes inside the Purvis residence and was wearing numerous items that belonged to Mr. Purvis. He was also carrying a backpack that belonged to Mr. Purvis.

"The defendant dropped the backpack. Officers immediately checked it and located a .40 caliber Smith & Wesson semiautomatic pistol with one live round in the magazine as well as several stolen items from the Purvis residence. Those included a gaming player and Purvis's passport. Inside the Purvis residence, clothes that Mr. Grable had been wearing during the shooting were located, and it should be noted that Mr. Purvis did not give consent or authority for Mr. Grable to enter his residence and certainly did not give consent or authority for him to steal any of his items.

4

"Officers went back to Sunrise Point Elementary to interview individuals. Officers also responded with Efren Joaquin Gomez and Todd Eugene Davis who . . . had been shot and were being loaded up for transport to Overland Park Regional Medical Center. Mr. Gomez had been shot at least once in the neck. Mr. Davis had been shot six times over various portions of his body. Mr. Davis . . . died from those gunshot injuries.

"Mr. Gomez survived his injuries and is currently paralyzed from the neck down.

"[D]etectives spoke to several eyewitnesses there at Sunrise Point. That included Landon Norris who advised that several people were working on that job site at the playground. . . . Those individuals were Efren Joaquin Gomez, Todd Eugene Davis, Sergio Eduardo Pelayo Covarrubius, Santiago Diaz Vega, and Santos Banegas, as well as Mr. Grable. Mr. Norris reported that he saw . . . Grable[] take a black handgun out of his backpack and shoot Gomez by the swings. He said he believed there were two shots fired at Gomez who immediately dropped. Norris, Vega, and Banegas took off running in a . . . westerly northwesterly direction from the playground.

"Norris advised that Grable chased after them with his handgun causing reasonable apprehension of bodily harm by the victims that are noted in the Complaint as victims of aggravated assault. It should be noted that Santiago Diaz Vega would indicate that the defendant raised a firearm at him causing him to fear for his life because the defendant was armed with a handgun.

"Furthermore, Santos Raimundo Cruz Banegas would also testify that the defendant raised a firearm at him causing him to be in reasonable apprehension of immediate bodily harm because the defendant was armed with a deadly weapon, to-wit: the handgun.

"And finally Sergio Eduardo Covarrubius would testify . . . the defendant raised a firearm at him placing him in reasonable apprehension of immediate bodily harm by a deadly weapon, to-wit: The handgun that the defendant was holding.

5

"Judge, those victims all provided similar statement to police indicating that Mr. Grable was upset there at the job site that morning. . . .

"[I]nvestigators pulled security footage from the elementary school which captures the shooting of Mr. Gomez and the raising of the firearm at other victims. It also captures Mr. Grable clearly carrying a firearm and a backpack getting into the work truck and leaving the scene."

The district court accepted his pleas and found him guilty on every count.

Before sentencing, Grable moved to depart to a hard 25 under K.S.A. 2020 Supp. 21-6620(c)(1)(A). It provided: "[A] defendant convicted of murder in the first degree based upon the finding of premeditated murder shall be sentenced [to a hard 50] . . . unless the sentencing judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose [a hard 25.]" Grable's motion offered four mitigating factors: (1) his actions resulted from mental health issues, (2) he had no prior criminal history, (3) he accepted responsibility for his crimes by pleading guilty to all charges, and (4) he had a supportive family to assist in his rehabilitation.

At sentencing, the court heard testimony from Grable and a forensic psychiatrist retained by Grable. It also received personal statements from Grable, his father and cousin, and the murder victim's two children. The court found the mitigating factors did not amount to substantial and compelling reasons to overcome the statute's default hard 50 life sentence for Grable's crimes, so it denied departure.

The court sentenced Grable to a hard 50 life sentence for first-degree premeditated murder; 155 months' imprisonment for attempted first-degree premeditated murder; 12 months' imprisonment for each of three aggravated assault convictions; 59 months' imprisonment for each of the two aggravated robbery convictions; and 12 months'

6

imprisonment for burglary of a dwelling. The court ordered the eight sentences to run concurrent.

Grable now directly appeals to this court, objecting to the court's denial of his departure motion. Jurisdiction is proper. See K.S.A. 2020 Supp. 22-3601(b) (listing criminal cases permitted to be taken directly to Supreme Court, e.g., life sentence); K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2020 Supp. 22-3601).

No Abuse of Discretion

An appellate court examines a district court's departure ruling for abuse of discretion. A court abuses its discretion when its decision is based on an error of law; substantial competent evidence does not support a factual finding on which the court's exercise of discretion is based; or no reasonable person would take the view adopted by the court. *State v. Galloway*, 311 Kan. 238, 252-53, 459 P.3d 195 (2020). Grable does not claim the court made an error of law or fact when denying the requested departure. He simply challenges the ultimate decision's reasonableness, essentially contending no reasonable judge would decline to depart from a hard 50 sentence given his proffered mitigating factors.

*Grable's mitigating circumstances claims*

At sentencing, Dr. William Logan, a forensic psychiatrist who had interviewed Grable for an hour and 45 minutes and reviewed his mental health history records, explained that Grable started receiving treatment for depression and attention-deficit/hyperactivity disorder when he lived in Louisiana, before moving to Kansas in 2016. Grable continued treatment when he moved. He was prescribed "Trileptal" for

7

depression and "Vyvanse" and "Adderall" for ADHD. Dr. Logan said that "if [Vyvanse and Adderall are] abused, they can cause paranoia." But the record does not explicitly state Grable abused these medications.

Dr. Logan found indications Grable could have been paranoid around the time the shooting occurred. For instance, Grable "believed people were following him," and that "his in-laws were connected to the mafia and that they had put a hit out on him." He also covered up electrical outlets in his apartment to prevent people from spying on him. And several weeks before the shooting, Grable told a coworker he had thought about shooting his coworkers. From these indicators, Dr. Logan concluded Grable's mental health problems affected his criminal actions, stating "his judgment and his perceptions and his impulse control were compromised" on the day of the shooting.

Grable's family and the murder victim's family provided personal statements rather than sworn testimony. His father said Grable believed his wife and her sisters had been molested repeatedly by their father (Grable's father-in-law) and because he found that out, the father-in-law was going to have him killed. And for about a month leading up to the shooting, whenever they met, Grable searched his own father for a wire. His father said he did "everything" to let Grable know "there's nothing going on. That's not happening." Grable's cousin made a similar statement. In particular, the cousin said that around the end of May 2018 he "really started noticing a big difference in the way [Grable] was acting," and in early June noticed Grable was "carrying a gun with him, saying that people were after him. He could almost feel bullets . . . and people staring at him."

Grable noted he had no prior criminal convictions and pointed out he had pled guilty to every charged crime. He also apologized for his crimes to the victims. For

family support, he noted he had a close relationship with his father. He said he had "daily interaction[s]" either by phone conversation or in-person visits.

*The district court's decision*

In denying the departure motion, the record reflects the district court considered each mitigating circumstance advanced by Grable while also considering the tragic facts and their ramifications. The court noted there was no provocation, no reason, and no rational ground for rage or anger towards the victims. And, the court continued, after Grable shot Gomez, who became permanently paralyzed from the neck down, Grable pursued and killed another victim, Davis, who raised his hands and yelled, "No, no, no," before being shot six times. The court observed, "The injuries to Mr. Gomez are also relevant, as the State points out [this was] perhaps a centimeter away from a death penalty case," which was an apparent reference to K.S.A. 2020 Supp. 21-5401(a)(6) ("Capital murder is the . . . intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct.").

The court focused primarily on whether Grable's mental health issues warranted departure. It said it carefully read Dr. Logan's report and recognized Grable's medical and psychiatric issues at the time of the crime, but ultimately determined those concerns were not a substantial and compelling reason to depart when balanced against the attack on multiple victims without provocation or reason, and after having expressed the desire to kill his coworkers several weeks before the crime.

The court also noted there were five other victims at whom Grable pointed his gun, i.e., three aggravated assault victims and two aggravated robbery victims, commenting that it was "[f]ortunate that nothing else worse happened." The court also

9

observed the shooting occurred at a school playground where children play, albeit in the middle of the summer when students were not there. And the court found Grable's attempt to flee and elude showed he knew right from wrong, while his entry into Purvis' home to change clothes showed Grable's ability to understand his actions.

Finally, the court considered the personal statements by the murder victim's children. His 18-year-old daughter explained she and her brother not only lost their father, but that she suffers from anxiety and depression. She said she had nightmares in which she is shot to death like her father and declared her life was no longer the same because of Grable's crimes. The 13-year-old son said he is now "full of anger" and has "a lot of hate in [his] heart" because his father was brutally murdered. He added, "I have no forgiveness."

Based on this and the court record, the district court held that Grable's mental health issues and other mitigating circumstances, taken together, did not amount to substantial and compelling reasons to depart. The court acknowledged it was not underestimating Grable's voluntary admission to the charged offenses, but said it recognized the State's evidence of guilt included video footage conclusively depicting the shooting.

*Discussion*

K.S.A. 2020 Supp. 21-6620(c)(1)(A) directs a district court to order a person convicted of premeditated first-degree murder to serve a sentence of life with a mandatory minimum 50-year term of imprisonment before parole eligibility, subject to a narrow exception not applicable here for offenders with the worst criminal histories. See K.S.A. 2020 Supp. 21-6620(c)(1)(B). But the court may depart from the hard 50 sentence

10

authorized under K.S.A. 2020 Supp. 21-6620(c)(1)(A) by finding substantial and compelling reasons to do so.

K.S.A. 2020 Supp. 21-6625(a) sets out a nonexclusive list of mitigating circumstances that sentencing courts may rely on. A defendant's psychological state can be a mitigating factor under subsections (a)(2) ("The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances.") and (a)(6) ("The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired."). A lack of prior criminal history can also be a mitigating factor under K.S.A. 2020 Supp. 21-6625(a)(1) ("The defendant has no significant history of prior criminal activity."). And besides these statutory considerations, acceptance of responsibility and family support have both been recognized as mitigating factors in our caselaw. See, e.g., *State v. Morley*, 312 Kan. 702, 713-14, 479 P.3d 928 (2021) (noting defendant's taking responsibility by "'pleading guilty'" can be a mitigating factor, relying on *State v. Jolly*, 301 Kan. 313, 331, 342 P.3d 935 [2015]); *State v. Spencer*, 291 Kan. 796, 814, 248 P.3d 256 (2011) ("[W]e reluctantly concede that a reasonable person could decide that the support of family and friends was a substantial and compelling reason to grant Spencer's departure from Jessica's Law.").

"The term 'substantial' in the sentencing departure context means something that is real, not imagined, and of substance, not ephemeral." *Morley*, 312 Kan. 702, Syl. ¶ 3. And we have explained when addressing the revised Kansas Sentencing Guidelines Act, K.S.A. 2020 Supp. 21-6801 et seq., that "[a] compelling reason to override the statutory presumptive sentence of imprisonment is one that forces a court—by the case's facts—to abandon the status quo and venture beyond the presumptive sentence." 312 Kan. 702, Syl. ¶ 4. And even if a district court finds substantial and compelling reasons to depart in first-degree premeditated murder cases, the court is still required to impose a life

11

sentence, but it must generally reduce the mandatory minimum prison term from 50 to 25 years. K.S.A. 2020 Supp. 21-6620(c)(2)(A).

Here, the district court performed a comprehensive analysis of the attendant circumstances when denying departure. It noted all the factors Grable advanced and weighed them against the facts. And given Grable's eight felony offenses and their momentous repercussions to the victims and their families, we cannot hold that the district court abused its discretion.

Granted, each factor Grable advanced can be considered substantial, i.e., real. But as the district court pointed out, acceptance of responsibility seems to be a minimal concern given the overwhelming direct and physical evidence and victim impact. Similarly, Grable's notions about the close relationship with his family and his assertion this would help him going forward do not convince us that no reasonable judge would have rejected his requested departure sentence.

In similar cases, this court has generally upheld denial of departure motions. For instance, in *State v. McLinn*, 307 Kan. 307, 409 P.3d 1 (2018), the defendant was convicted of first-degree premeditated murder and apologized to the victim's family. She offered three mitigating circumstances at sentencing: "She had no significant history of prior criminal behavior, [she] was under the influence of extreme mental or emotional disturbances, and she was suffering from post-traumatic stress." 307 Kan. at 347. And the defense's expert witness testified she had four personalities caused by dissociative identity disorder. But two independent experts disputed the multiple personality claim, concluding she suffered instead from borderline personality disorder with antisocial features. The *McLinn* court held the district court did not abuse its discretion when it denied departure. 307 Kan. at 349.

In *State v. Murillo*, 269 Kan. 281, 7 P.3d 264 (2000), the defendant also was convicted of first-degree premeditated murder and related offenses. He received a hard 40 sentence for the murder conviction. At that time, K.S.A. 21-4635 provided that when a defendant is convicted of first-degree murder, the court must determine whether the defendant must serve a mandatory term of imprisonment of 40 years. To make that determination, a court considered certain statutorily defined aggravating circumstances, as well as mitigating circumstances. If the court found one or more aggravating circumstance existed and was not outweighed by any mitigating circumstances, it was required to impose a hard 40. 269 Kan. 281, Syl. ¶ 3. Murillo argued as his mitigating factors that he was under the influence of crack cocaine, rendering him under extreme mental or emotional disturbance, and that he lacked the capacity to appreciate the criminality of his conduct. Even so, the *Murillo* court held the district court did not abuse its discretion by imposing a hard 40. 269 Kan. at 289-90.

As in *McLinn* and *Murillo*, the district court did not abuse its discretion when denying Grable's departure motion.

Affirmed.