IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,449

STATE OF KANSAS,
*Appellee*,

v.

ADRIAN N. ZONGKER,
*Appellant.*

SYLLABUS BY THE COURT

1.

While the PIK instruction defining premeditation is generally sufficient, in cases involving a temporal question—and where the temporal intricacies embedded in the legal concept of premeditation may confuse the jury—additional instructional language defining premeditation is appropriate so long as it properly and fairly states the law and is not reasonably likely to mislead the jury.

2.

A defendant meets the first prong of establishing prosecutorial error by showing that the prosecutor misstated the facts in evidence, even if the misstatement was accidental or inadvertent.

3.

Generally, we do not address the merits of an ineffective assistance of counsel claim for the first time on appeal. Instead, the usual course is a remand to the district court for an evidentiary hearing on the ineffective assistance claim. We will only address the merits of an ineffective assistance claim for the first time on appeal on the rare

1

occasions when the evidentiary record is well-established and the merits of the claim are obvious. If a defendant does not request a remand, this court need not order one sua sponte.

4.

The defendant bears the burden to persuade a sentencing court that a mental examination, evaluation, and report under K.S.A. 22-3429 serves the interests of justice. K.S.A. 22-3429 does not require courts to raise this issue sua sponte; a district court does not abuse its discretion in failing to order an evaluation if a defendant does not request one.

5.

K.S.A. 21-6620(c)(2)(A) does not require a district court to state on the record its reasons for denying a departure motion and imposing a presumptive sentence.

Appeal from Sedgwick District Court; SETH RUNDLE, judge. Oral argument held January 31, 2024. Opinion filed September 13, 2024. Conviction affirmed, sentence vacated in part, and case remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Adrian N. Zongker was a customer at a restaurant owned by Oscar and Amelia Acosta in Wichita. He had with him a diaper bag and a zebra striped clutch.

2

Zongker's appearance and demeanor immediately made Amelia uncomfortable, but she took his order while Oscar observed on their security cameras.

After he finished his food, Zongker placed a second order. When it was ready Amelia brought it out to the booth where Zongker was seated, and Amelia picked up the empty tray in front of Zongker as she sat down the second tray of food. She noticed that there was a Wal-Mart receipt on the tray as she took it to the trash.

At this point a family entered the restaurant and Amelia went to take their order. Zongker finished up his meal, took his second tray to the trash, and exited the restaurant. Amelia felt relieved, but remained apprehensive because she could see Zongker standing outside digging through his diaper bag.

Shortly after, Zongker came back into the restaurant and went to the booth where he had been sitting, where he appeared to frantically search for something. Amelia asked him what he was looking for, but Zongker did not reply. Zongker then went to the trash can, still clearly searching for something. Amelia again asked Zongker what he was looking for and he indicated that he was looking for a receipt. Amelia told him that a Wal-Mart receipt had been on the tray she had emptied into the trash can. She retrieved it from the trash and handed it to him. But Zongker then said he was looking for a little bag containing coins. Zongker continued his search around the trash, eventually returning to the booth and dumping everything out of his diaper bag, only to return to the trash can.

While Zongker was continuing his search between the booth and the trash can, Oscar came out of the kitchen and carried the trash outside to the front of the restaurant so Zongker could continue his search there. Amelia could see them from the window and said Oscar appeared relaxed and was just standing and watching Zongker dump all the trash on the ground.

Amelia returned her attention to the customers inside, and suddenly she heard a gunshot. She looked up and immediately saw Oscar running into the restaurant and yelling, "[E]verybody to the floor. Get down to the floor." Amelia dropped to the floor, crawled over to Oscar, and saw the gunshot wound on his chest. She called 911 and grabbed the key to lock the restaurant door. Oscar later died at the scene. Immediately after shooting Oscar, Zongker returned to digging through the trash for several moments, before fleeing in the direction of a nearby QuikTrip.

Law enforcement quickly located Zongker a short distance away. When police approached Zongker, he dropped his bag onto the ground, put his hands in the air, and said, unprompted: "I did it. I did it. The gun's in the bag." Officers arrested Zongker, during which he asked the officers: "Is he going to live?" Upon search of Zongker's zebra clutch and diaper bag, police found a gun, ammunition, and some silver collector coins.

The State charged Zongker with premeditated first-degree murder and criminal possession of a weapon. After the charges were filed, Zongker was evaluated and found competent to stand trial. Defense counsel did not object to that finding. Zongker rejected a deal to plead guilty to intentional second-degree murder. Instead, he pled no contest to criminal possession of a weapon and proceeded to trial on the murder charge.

While in jail, Zongker had telephone conversations with his parents, which were recorded by jail officials and played for the jury. During the calls, Zongker explained that he was justified in the killing because he believed the people in the restaurant had stolen several hundred dollars' worth of gold and silver from him.

In one call, Zongker's mom said:  "It's a family of five . . . they had four kids and a wife, you took that man away from his family." Zongker responded:  "You know what, they took $700 from me . . . I set two gold coins down . . . okay, but that's $700, okay, they did me like that, they took a lot of money from me."

A few days later, on another call, this exchange occurred:

Family member:    "A human life isn't worth . . . $600."

Zongker:    "If you add it all up, this whole shit cost me $1,500 when you add it all up."

Family member:    "I just don't approve of, you know, taking people's life over stuff like that."

Zongker:    "$1,500? What if I stole $1,500 . . . from you?"

Family member:    "You don't kill somebody over $1,500, okay? You just don't."

Zongker:    "If your property is being stolen, that's stand your ground right there."

In another clip, Zongker again emphasized:  "Okay, $802 in gold, okay? $802 in gold, okay? They may have paid for their business, but $802 in gold."

And another:

Family member:    "Nobody's life is worth a dollar, nobody's life is worth a billion dollars."

5

Zongker: "How about $800 in gold, . . . and $120 silver, . . . about $900 bucks. How 'bout that? . . . What if I took your wedding ring, your mom's wedding ring and sold it, how would you feel about that?"

Family member: "Well I'd be really pissed off, but I'm not gonna kill you over it."

Zongker: "That's exactly what happened . . . the same ole, the Mexicans, they did that to me. Okay? They been doing it just to piss me off. They think I'm stupid or something. I was drunk!"

And finally:

Zongker: "Let them try to get to me, I'll kill another one of them if they try to get to me—"

Family member: "No, no, no, no. No, no, no! You don't understand—"

Zongker: "I ain't scared of no fuckin [unintelligible] them . . . Okay, we have this man, who lost his life, get over it?"

Family member: "Nobody gets over shit like that, that man had a family! He was supporting, getting your damn check, man—"

Zongker: "Nine hundred dollars—"

Family member: "The man owned the fucking business—"

Zongker: "Well that's my $900, that's my money that he stole from me."

The jury also heard from Dr. Bradley Grinage, a psychiatrist, who interviewed Zongker before trial. Dr. Grinage testified that Zongker has an average IQ and he had seen no evidence of "cognitive disability, learning disability, or intelligence problem." He

6

testified that Zongker has a personality disorder, bipolar disorder, and autism spectrum disorder, but that Zongker did not have schizophrenia. After reviewing all available evidence, Dr. Grinage found with a reasonable degree of medical certainty that though Zongker did suffer from mental disease, at the time of the shooting, his mental disease was not "sufficient to interfere with his ability or capacity to formulate intent," and that there were "no significant cognitive psychotic symptoms that would suggest that he was unable" to form the requisite intent.

During their sessions, Zongker provided Dr. Grinage with "rational, nonpsychotic" reasons for killing Oscar. Much like in the phone calls, Zongker expressed that he knew that someone had taken his coins and so he was acting in self-defense. The justifications he offered to Dr. Grinage for why he shot Oscar were: (1) "he would freeze to death" without his coins; (2) when Oscar was helping him go through the trash he "called him a name" and threatened "to call the police"; (3) "'[i]t was [his] money'"; and (4) "he's been a victim all of his life, and he had to stand his ground."

The jury was given instructions for premeditated first-degree murder as well as a lesser included instruction for second-degree murder. The jury was also instructed:

> "You may find the defendant guilty of murder in the first degree, guilty of murder in the second degree, not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required culpable mental state, or not guilty.

> "When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt."

The jury convicted Zongker of premeditated first-degree murder.

At sentencing, Zongker provided a summary of his lengthy written allocution as follows:

"[T]his is not the only time me, Adrian Zongker, has been attacked, mugged, bullied, extorted for my money. These group of people exploit and extort me any chance they get. This is one of many times that's been in front of you, . . . that I've been attacked and mugged for my money. These people set me up that day knowing that I got my disability and my back pay; set me up to take my stuff, and . . . they set me up to rob me—mug me—and . . . that's it.

"I want—I want—I want justice against these groups of people who have embezzled me, allegedly, over phone calls. I just found out about this. I was talking to them on the phone after the fact—months after the fact. Got $40,000 out of me. They're stacking my disability when I was locked up. I didn't know this until now. I want justice. I want them brought down too."

Just after Zongker provided this summary, the court, after looking over Zongker's written allocution, asked Zongker: "I just got to the part where you said, 'I probably deserve a life sentence.' . . . Is that a part of your statement?" Zongker responded: "Yeah. I was drunk and I probably lost my own stuff. But, I do have evidence that it's part of a larger conspiracy. So . . . yeah."

Zongker moved for a downward durational departure, offering as mitigating factors the fact that he "suffers from a mental disease and has a long history of mental impairment and was lacking in substantial capacity for judgment at the time of the offense," and that despite the jury's verdict, there was "relatively little evidence to support premeditation and the killing more likely appears to have been done on sudden impulse." The district court denied the motion and imposed a hard 50 life sentence.

Zongker directly appealed.

DISCUSSION

*Sufficient evidence supports Zongker's conviction for premeditated murder.*

Zongker first claims that the "killing in this case appears to be a textbook example of what a killing without premeditation looks like." He asserts that in contrast to this court's other cases evaluating the sufficiency of premeditation, the record here contains no "evidence of any sort of fight, quarrel, or struggle, or multiple wounds or strangulation over a period of time." Instead, Zongker compares the killing in this case to an "'impulse' decision," one made "'without a second thought,'" or an "internal, snap decision." *State v. Stanley*, 312 Kan. 557, 572, 478 P.3d 324 (2020). And Zongker states that "[r]eview of the video in this case shows exactly this . . . type of act."

When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "[E]ven the gravest offense can be based entirely on circumstantial evidence. Sufficient circumstantial evidence does not need to exclude every other reasonable conclusion to support a conviction. [Citations omitted.]" *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022); see also *State v. Phillips*, 299 Kan. 479, 498, 325 P.3d 1095 (2014) ("[I]t is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable.").

We have identified nonexclusive factors to consider in determining whether circumstantial evidence gives rise to an inference of premeditation. These factors include the:  (1) nature of the weapon used; (2) lack of provocation; (3) defendant's conduct

before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) dealing of lethal blows after the victim was rendered helpless. The number of factors present does not affect the analysis of what inferences can be reasonably drawn, because in some cases one factor alone may be compelling evidence of premeditation. However, use of a deadly weapon by itself is insufficient to establish premeditation. *State v. Killings*, 301 Kan. 214, Syl. ¶ 3, 340 P.3d 1186 (2015).

This killing was committed with a firearm, a deadly weapon. Oscar did not provoke Zongker; rather, the killing was committed during an encounter where both shooter and victim had been "engaged in a relatively calm confrontation" during which neither party yelled or displayed aggression toward one another. *State v. Schumacher*, 298 Kan. 1059, 1068, 322 P.3d 1016 (2014); see also *State v. Pabst*, 268 Kan. 501, 513, 996 P.2d 321 (2000) (finding sufficient evidence of premeditation in part because although defendant and victim were engaged in a "mild, nonviolent argument," defendant was not provoked). Zongker, without warning, shot Oscar at point blank range in the chest. And as soon as he had done so, he resumed looking through the trash without even a glance at Oscar, even though he knew his shot had hit Oscar as evidenced by his asking the police: "Is he going to live?" Zongker did not seek medical aid for Oscar or attempt to call for help after shooting him. See *State v. Carter*, 305 Kan. 139, 153, 380 P.3d 189 (2016) ("[A] defendant's conduct after a killing indicative of earlier premeditation has included failure to seek medical attention for the victim."); *State v. Hill*, 290 Kan. 339, 363, 228 P.3d 1027 (2010) ("[T]he evidence that Hill did not seek medical attention for Yanofsky circumstantially supports premeditation and intent to kill.").

Zongker immediately confessed to the police, and no evidence was presented that he ever expressed remorse. See *Carter*, 305 Kan. at 153 (Statements that "show lack of remorse are in the same category as the defendant's post-killing conduct in our previous cases and could be considered by the jury for whatever weight they would bear. . . . The fact that lack of remorse may not *always* give rise to an inference of premeditation does

not mean it *never* can."). Rather, he continuously doubled down on justifying his actions in both the series of phone calls and in his interviews with Dr. Grinage. His insistence that he was entitled to stand his ground because "the Mexicans" had stolen money from him—even asserting that he would "kill another one of them" if they tried it again—all may give rise to a reasonable inference of a premeditated act.

Zongker was "free to argue to the jury that the circumstantial nature of much of the evidence created reasonable doubt, but on appeal we accept the circumstantial evidence in the light most favorable to the State when assessing sufficiency." *State v. Ward*, 292 Kan. 541, 581-82, 256 P.3d 801 (2011). Zongker's jury was given options for either premeditated first-degree or intentional second-degree murder. It was also specifically instructed that if there was a "reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt." To reach the result Zongker requests, we would have to make our own credibility determinations and reweigh the evidence. But these are not tasks an appellate court performs when conducting a sufficiency review. Instead, we consider all evidence—even if there is conflicting evidence or reasons to question its credibility—and do so in the light most favorable to the State. *Phillips*, 299 Kan. at 500-01. In so doing, we conclude the circumstantial evidence establishing premeditation is sufficient.

*The district court did not err in declining to give an instruction for voluntary manslaughter.*

To analyze Zongker's second claim of error, we begin with our familiar multi-step process for analyzing jury instruction issues, determining (1) whether the issue is preserved for appeal, (2) whether the instruction was legally appropriate, (3) whether the instruction was factually appropriate, and (4) if any identified error was harmless. *State v. Wimbley*, 313 Kan. 1029, 1033, 493 P.3d 951 (2021).

11

Here, the first and second steps of the analysis are satisfied: Zongker preserved the voluntary manslaughter instruction issue for appellate review by requesting it at trial, and voluntary manslaughter is a lesser included offense of premeditated first-degree murder, meaning the instruction was legally appropriate. *State v. Uk*, 311 Kan. 393, 397, 461 P.3d 32 (2020). In determining whether a lesser included instruction was factually appropriate, we ask whether there was sufficient evidence in the record, viewed in the light most favorable to the requesting party, to have supported a conviction for the lesser included offense. *State v. Couch*, 317 Kan. 566, 591, 533 P.3d 630 (2023).

Here, Zongker's claim fails. K.S.A. 21-5404(a)(2) provides: "Voluntary manslaughter is knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under . . . K.S.A. 21-5225." K.S.A. 21-5225 provides:

> "A person who is lawfully in possession of property other than a dwelling, place of work or occupied vehicle is justified in the use of force against another for the purpose of preventing or terminating an unlawful interference with such property. Only such use of force as a reasonable person would deem necessary to prevent or terminate the interference may intentionally be used."

Zongker relies on *State v. Qualls*, 297 Kan. 61, 70, 298 P.3d 311 (2013), to assert that "there is no objective requirement" under the voluntary manslaughter theory of imperfect self-defense. In other words, Zongker argues that if one looks only at the words "unreasonable but honest belief" in K.S.A. 21-5404(a)(2), the evidence when viewed in the light most favorable to him would support a conviction for voluntary manslaughter. And if this is where the analysis both began and ended, we would agree with him.

12

There is, however, more to it than that. We considered precisely this question when we clarified the meaning of *Qualls* in *State v. Roeder*, 300 Kan. 901, 921-24, 336 P.3d 831 (2014). There we explained that a "purely subjective interpretation does not comport with the statutory language," because had

> "the legislature had intended to allow a defendant to make up his or her own version of the law based upon the defendant's declaration of an honest belief, the statute could have simply defined the crime as an intentional killing of a human being committed upon an unreasonable but honest belief that circumstances existed that justified deadly force. But the statute adds something; it requires that the honest belief has to be 'that circumstances existed that justified deadly force under [K.S.A. 21-5222, 21-5223 or 21-5225], and amendments thereto.'" 300 Kan. at 923.

Here, under K.S.A. 21-5225, the scope of a defendant's "unreasonable but honest belief" that deadly force was justified is limited to only such "force as a reasonable person would deem necessary to prevent or terminate" an unlawful interference with property. Zongker insists he "*honestly* believed that he needed to protect his property." But even assuming Zongker honestly believed he needed to protect against an unlawful interference with his coins, this circumstance would not have justified killing Oscar because no reasonable person in these circumstances could have deemed the killing of Oscar as necessary to prevent or terminate the unlawful interference of Zongker's possession of his coins. This is especially true when considering, as noted above, Zongker did not even claim Oscar was the individual who stole his coins. And in fact, Oscar was not even present when Zongker's coins allegedly went missing. Instead, Zongker maintained that he had "been a victim all of his life" and that he had to "stand his ground." On these facts, a conviction for voluntary manslaughter would not have been supported. It was not error for the district judge to decline to give the instruction.

13

*The district court did not err in giving additional instructions regarding premeditation.*

At trial the State requested that additional language defining premeditation from *State v. Bernhardt*, 304 Kan. 460, 472, 372 P.3d 1161 (2016), be included in the jury instructions. The district court gave the instruction over defense counsel's objection. Therefore, the issue is preserved for our review. 304 Kan. at 469.

Jury Instruction No. 4 contained the standard PIK premeditation instruction, followed by four additional paragraphs drawn directly from our decisions in *Stanley*, 312 Kan. at 562-63, *State v. Stafford*, 312 Kan. 577, 580, 477 P.3d 1027 (2020), and *Bernhardt*, 304 Kan. at 464. The instruction as given stated:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct.

"Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand.

. . . .

"Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

14

"Premeditation can occur during the middle of a violent episode, struggle or fight."

The State, in requesting the additional paragraphs, explained that it felt "the before and after conduct language is helpful, as is the process of thinking about a proposed killing before engaging in the contact. It doesn't have to be present before." The district court agreed, explaining:

"I'm going to give the State's requested premeditation definition, and the reason why is, even the last sentence, it says premeditation can occur during the middle of a violent episode, struggle, or fight. That—they might think there was some sort of fight of some degree going on. I think the evidence of that is pretty thin. But I think what the State's definition does is, it provides some more parameters. So, even if the jury does not believe that there was a violent episode, struggle, or fight going on, this definition lets them know that that's where one of the, you know—that even if there is a serious violent episode going on, that that does not exclude premeditation from occurring during the middle of that. And I think that is helpful for them to understand what—what premeditation means, and that it can occur even in the middle of something that they may believe didn't rise to the level of a violent episode, but if it had premeditation, they could still find that it occurred."

Zongker contends that though this additional instruction was legally appropriate— as it is a correct statement of the law—it was not factually appropriate because in his case there was no fight, quarrel, or struggle. The State asserts that evidence of a fight, quarrel, or struggle is not necessary in order to use the additional language. Rather, the instruction can be used whenever a temporal question exists. And the State asserts there was a temporal question in Zongker's case, because several minutes had elapsed from the time Zongker reentered the restaurant to the moment that he fired the gunshot.

15

We agree. While we maintain that generally, the PIK alone is sufficient, see *State v. Hilyard*, 316 Kan. 326, 336, 515 P.3d 267 (2022), the additional language is appropriate in any case where jurors could be confused "over the temporal intricacies embedded in the legal concept of premeditation." *Stanley*, 312 Kan. at 565. In Zongker's case, he could have formed premeditation after he had begun searching through the trash, but before he went outside and killed Oscar. In that sense, the temporal clarification in the instruction was helpful. And despite the instruction's reference to a fight, quarrel, or struggle, we do not find that that reference would mislead the jury. See *Hilyard*, 316 Kan. at 334 (When the given instructions "were sufficient, meaning that they properly and fairly stated the law and *were not reasonably likely to mislead the jury*, there is no error for an appellate court to correct." [Emphasis added.]).

*The State did not commit reversible prosecutorial error.*

Zongker next alleges that several instances of prosecutorial error during closing arguments require reversal of his conviction. He points to three instances where the prosecutor misstated the facts, and one instance where he alleges the prosecutor misstated the law.

We employ a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if

16

the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

A defendant meets the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences outside of what the evidence showed. *State v. Wilson*, 309 Kan. 67, 78, 431 P.3d 841 (2018) ("When a prosecutor argues facts outside the evidence, the first prong of the prosecutorial error test is met."). In determining whether a particular statement falls outside of the wide latitude given to prosecutors, we consider the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020).

During closing arguments, the prosecutor claimed Zongker murdered Oscar "by shooting him in the head [sic] just because he didn't get what he wanted." Zongker admits this was just an "unintentional oversight," though our caselaw suggests it is error nonetheless. See *State v. Sturgis*, 307 Kan. 565, 570, 412 P.3d 997 (2018) ("[A] prosecutor commits error by misstating the evidence, even when the misstatement is accidental or inadvertent."); *State v. Blansett*, 309 Kan. 401, 416-17, 435 P.3d 1136 (2019) (prosecutor stated "I recall that in [defendant's] testimony," even though defendant had not testified; prosecutor quickly corrected himself that he was referring to testimony of others who repeated what defendant said; though the "misstatement was repaired quickly," it was still prosecutorial error); *State v. Bodine*, 313 Kan. 378, 411, 486 P.3d 551 (2021) (assumed error when prosecutor claimed victim's body had no eyes when evidence only had shown victim had no "eye fluid").

But even considering this misstatement as error, we easily conclude it was harmless, as there is no reasonable probability it contributed to the verdict. There was no dispute that Oscar was shot in the chest. The error was clearly a result of a slip of the tongue and had no effect on the outcome of the trial.

Next, Zongker claims the prosecutor erred by mischaracterizing Dr. Grinage's testimony. As noted above, Dr. Grinage was careful not to opine on whether Zongker possessed the intent to kill; rather, he precisely articulated that his conclusion was only that Zongker's mental disease was not "sufficient to interfere with his ability or capacity to formulate intent," and that there were "no significant cognitive psychotic symptoms that would suggest that he was unable" to form the requisite intent. But in closing, the prosecutor stated:

> "**[Dr. Grinage] told you in no uncertain terms:  In spite of that, the defendant still possessed the necessary intent to kill.** That evidence can only be determined whether or not he has the culpable mental state. You'll see a definition for that later in the instructions, that culpable mental state. That's one of the elements that the State has to prove as it pertains to the offenses of premeditated first-degree murder and second-degree murder. *Dr. Grinage told you that he's capable of forming that intent*.

> "At the time of the murder, he was bipolar. He did not suffer from a mental disease or defect sufficient to render the defendant incapable of possessing the intent required to commit first-degree murder. Is he odd? Did he have odd behavior? Sure. Eccentric? Yes. Motivations that we cannot relate to or perhaps we don't understand? Yes. *He can still form intent*." (Emphases added.)

Zongker alleges the bolded statement is error, despite the italicized portions that came soon after which correctly described Dr. Grinage's testimony. The State agrees the first statement was incorrect, but asserts that because the prosecutor immediately followed up with correct statements the jurors would not have been misled.

18

Again, our precedent indicates that the first step in a prosecutorial error analysis is satisfied when the prosecutor misstates facts, even if they are quickly corrected. See *Sturgis*, 307 Kan. at 570; *Blansett*, 309 Kan. at 417. Thus the prosecutor's statement that "[Dr. Grinage] told you . . . the defendant still possessed the necessary intent to kill" was error.

Turning to the second step of our analysis, prosecutorial error is harmless if the State can show that there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109. Zongker asserts the error cannot be harmless given the very strong language that prefaced the misstatement—"[h]e told you in no uncertain terms"—and that the corrections that followed could not mitigate the strength of the initial misstatement.

We disagree. We find the error was harmless because (1) the State corrected itself immediately after making the misstatement; (2) Dr. Grinage was very careful to speak precisely during his testimony and repeatedly corrected the attorneys if they started to ask questions that blurred the line of what he could testify to; (3) the misstatement went to whether Zongker formed the requisite intent to kill (as opposed to premeditation) which was not a contested element at trial; and (4) the jury was instructed that it should disregard any statement not supported by the evidence. See *State v. Thomas*, 307 Kan. 733, 744-45, 415 P.3d 430 (2018).

Dr. Grinage was careful in how he presented his findings. For example:

"Q. Was he able to form the intent to kill?

"A. My—my request, how I address those who would have asked the question is: My expertise is not specifically on intent, but on mental disease or defect.

. . . .

19

". . . I drew an opinion that he did not have mental disease or defect sufficient to interfere with his ability or capacity to formulate intent as to the charges that were presented that I saw, which was first-degree murder."

And later:

"I don't—you know, at this particular point, I don't know if it's been stipulated that he did kill him. *My job is to evaluate and look at mental disease or defect*. And so, you know, what I can say is that he understood when he—when the police were interviewing him—someone did die—and he had an awareness that a person had died. And so, *I didn't specifically ask him, you know, did you do this specifically? That's not my job*." (Emphases added.)

Throughout his testimony Dr. Grinage remained consistent in how he characterized his findings and was careful to speak precisely. Considering how cautious Dr. Grinage was to be clear about what exactly he was testifying to, the prosecutor's error—that again, was quickly corrected—did not affect the outcome of the trial in light of the entire record. This is particularly true considering that the error did not relate to premeditation, but rather, went to whether Zongker had the intent to kill. Indeed, the simple "intent to kill" was conceded by Zongker's counsel both at trial and on appeal. In closing argument counsel stated:

"I'm not suggesting that you find Adrian Zongker not guilty of everything. I'm not for a minute suggesting that. I'm not suggesting that you not find that he had the inability to form intent. I'm not suggesting that either. . . . The big thing here, ladies and gentlemen, is not the culpable mental state. They've proven that. That's not what this is about. This is about the other element about premeditation."

Appellant's brief stated that "[b]ased on the evidence presented and appointed counsel's admissions, the jury could have reasonably found that Mr. Zongker intentionally killed Oscar."

Zongker next claims the prosecutor misstated the location of the gun at key moments during the events in question. The prosecutor claimed that when Zongker entered the restaurant,

> "*the gun is in the clutch, and the clutch is in the bag*. If you watch the video carefully, you're going to see that *he's retrieved the gun. He's got the clutch in his hand*. And so, as he searches and becomes more and more frustrated, he begins to look for: Who can I blame for this frustration?" . . . [H]e's getting more frustrated. . . . *The gun is now out of the bigger bag, and it's in his hand*. By the time he gets outside, he wields and uses the gun." (Emphases added.)

Zongker's counsel moved for a new trial because of these misstatements. He correctly argued that contrary to the State's assertions, the undisputed video evidence showed the clutch was initially outside of the diaper bag, and that Zongker only put the clutch into the bag as he was getting ready to go outside with Oscar. Thus, according to Zongker, the State's misstatements misled the jury into thinking Zongker "had removed the clutch from the bag so that he could shoot the guy, and that was his premeditation." But in reality, it was "the opposite. It's that the clutch is always outside of the bag. It goes into the bag for the first time right before he exits" the restaurant. Zongker's counsel also criticized the timing of the State's statements, because it was brought up in the second half of the State's closing argument, so defense counsel was left with no "opportunity to try to clean up that mistake."

The district court denied the motion, stating: "I'm not aware of the prohibition on counsel arguing facts in evidence at any particular point during their closing argument," and also noting that the jurors had the video available to them during their deliberations.

21

The State now admits in its brief that the prosecutor "misspoke" when discussing the location of the zebra clutch. But the State contends that "the broader point that the prosecutor was making was valid," because the video did show that Zongker retrieved and held the clutch before the shooting. In fact, Zongker had initially left both his bags at the booth while he searched the trash, but went back and retrieved only the clutch when Oscar first came to help him. The State asserts that it is reasonable to infer that Zongker viewed Oscar as a threat to his property and decided to retrieve the clutch at the time Oscar got involved, because Zongker was preparing to use the gun against him. As such, the "prosecutor did not err in making this observation and arguing that it was evidence that defendant was planning to use the weapon."

But even if this was fair commentary on the evidence broadly speaking, it is not what the prosecutor said when specifically discussing the evidence. The prosecutor told the jury that the gun was in the clutch and that *the clutch was in the diaper bag* the whole time and that Zongker *only* took it out as he was getting agitated during his search. The video shows that this simply is not true. As such, the prosecutor erred in making these statements. *Sturgis*, 307 Kan. at 570.

Again, once an error is established, the court turns to determining whether the State has demonstrated beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. *Sherman*, 305 Kan. at 109. As noted above, the district court instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." See *Thomas*, 307 Kan. at 744-45 (this instruction can mitigate a prosecutor's misstatement of fact and can support a finding of harmlessness). Though the prosecutor's statement that the "gun is in the clutch, and the clutch is in the bag" was not correct at the time Zongker entered the restaurant, the overall point that the

22

prosecutor was making—that Zongker kept his clutch close at hand during his search for his coins and while his frustration was building, including when Oscar first approaches him, and that he eventually removes the clutch and then removes, wields, and uses the gun—is supported by the video evidence. And the jury was instructed to disregard any statement not supported by the evidence. For these reasons we do not find that the prosecutor's error in misstating the location of the gun when Zongker entered the restaurant affected the outcome of the trial.

Finally, Zongker argues the prosecutor committed an error of law by stating: "He decides to carry a gun. He decides to pull the gun. He decides to aim. And he decides to pull the trigger." Zongker claims this argument is error because it suggests premeditation is always present when a person intentionally kills another person with a gun. We do not analyze statements in isolation. *Becker*, 311 Kan. at 182. Rather, we must also consider the surrounding context, which is as follows in this instance:

> "Premeditation means to have thought it over beforehand. The defendant is in the restaurant. He eats. He leaves. And then, he comes back. As he's coming back, he's digging through the trash. He's getting frustrated. He's getting angry. He believes either something has been lost or taken from him. He believes that he's been wronged. He believes that he's the victim. He follows the—he follows Mr. Acosta outside, and as he's helping him, the defendant kills him.

> "No specific time period required, but it requires more than that instantaneous, intentional act. It does require you to think about it beforehand. And, again, we have examples of the defendant returning to the restaurant, digging through the trash. *He decides to carry a gun. He decides to pull the gun. He decides to aim. And he decides to pull the trigger.* Those are intentional decisions that he's making over and over and over again. Does not have to be present before the interaction began. It can form at any time. It doesn't mean that an act is planned, contrived, or schemed beforehand.

"Okay. Back to these inferences. The nature of the weapon used. It was a gun. Can you think of a more lethal weapon than a gun? What are guns used for? Guns are used to kill. Semiautomatic handgun: He carried it on his person. He shot center mass at close range. There's only one reason you shoot someone center mass at close range, and that's to kill him. It penetrated his heart and his lungs; went through a ventricle and his aorta, two lobes of his lungs. Ladies and gentlemen, it was a kill shot.

"The lack of provocation: The defendant left the restaurant and came back. He comes back. You can decide for yourselves, but I would submit perhaps agitated because, at this point in time, he thinks that someone has stolen from him or he's lost something. He's digging through the trash and he's digging through the trash, and they ask him to stop. But, he continues to dig through the trash because he wants his own way.

"The victim helps him. The victim facilitates him in this attempt to find these coins. He takes the trash can outside. You can see it on the video. He's standing there much like this: Trash can, defendant, and the defendant continues to dig. And in response to that, the defendant shoots him center mass—aims to kill.

"Use your common sense, ladies and gentlemen. What inferences can you draw from that behavior? Defendant's conduct before the killing: He walks away. He comes back. He carries this handgun. It's with him all the time. He pulled it out, he aims, lifts the gun, aims, and fires.

"After the killing, he does continue to look for his coins, but then he leaves the area. You heard from Officer, I believe it was Seachris, that they had received information from a civilian that they saw the defendant digging around in some leaves looking like he was trying to hide the murder weapon.

"'I did it. I did it. The gun's in the bag.' His conduct afterwards—you saw Officer Jensen. You saw how big he was. He told you, six-six, 240. He was with-it enough to know not to tangle with a cop that big, and so the minute he saw Jensen draw down, 'I did it. The gun's in the bag.'

"'Is he going to live?' He asked, I believe it was Officer Howard: 'Is he going to live?' He knows, ladies and gentlemen. He knows he's killed a man. He chose to kill that man. He thought about it beforehand. He premeditated it. The State has proven this to you beyond a reasonable doubt.

"And this is one of those unique cases where we get to know. We have insight into what he was thinking at the time, because he later tells his parents on a jail phone call. He later tells them what he was thinking in that moment; why he did what he did. We don't often get to do that. We don't get to take pictures of the insides of peoples' heads. Sometimes, individuals tell us why they did what they did. But in this case, you have that information. He killed Oscar Acosta because he thought he was wronged, period. This defendant killed him with premeditation, because he believed, erroneously so, but he still believed that he was the victim. He's not a victim. He's not a victim.

"Again, as he's discussing this, his parents are telling him that what he did was wrong. His focus is on why he killed the victim, the fact that he believed that the victim stole from him. 'They took $900 from me. They took 120 in silver. That's 900 bucks. How about that? What if I took Mom's wedding ring and stole it? How would you feel about that?' 'Well, I would be really pissed off, but I wouldn't kill someone.' That's not what the defendant chose to do. The defendant chose to make himself—the defendant believed that he was the victim of a crime, and he chose to make himself judge, jury, and executioner of Oscar Acosta." (Emphasis added.)

When viewing the statement in context, it is apparent the prosecutor was giving the jury a list of all the evidence the prosecutor felt could contribute to a finding of premeditation. As this court has said in response to similar challenges: "The prosecutor here did not say that premeditation could be instantaneous. Rather, he pointed to the nature of the weapon used—a gun—and how it was used." *State v. Moore*, 311 Kan. 1019, 1041, 469 P.3d 648 (2020). "[T]he prosecutor's comments were within the bounds of the law because they described the totality of the evidence regarding premeditation

. . . . After properly stating the definition of premeditation, the prosecutor pointed out key factual intervals supported by the evidence that established premeditation." *State v. Brownlee*, 302 Kan. 491, 516-18, 354 P.3d 525 (2015).

The same is true here—the challenged statement was made in the midst of the prosecutor discussing each of the other factors supporting premeditation: the lack of provocation, as demonstrated by Oscar merely helping Zongker in his search; Zongker's conduct in retrieving the gun when Oscar got involved; and his conduct immediately after the killing in his interactions with the police, as well as the later phone calls where he explicitly and repeatedly asserts that he killed Oscar because he believed someone stole money from him. As in *Brownlee*, the prosecutor prefaced his comments with a correct definition of premeditation, telling the jury there is "[n]o specific time period required, but it requires more than that instantaneous, intentional act. It does require you to think about it beforehand." See also *State v. Jones*, 298 Kan. 324, 336-37, 311 P.3d 1125 (2013) (prosecutor's reference to defendant's "'five-pound pressure on [the] trigger'" was not error when considered in context, because it was part of the prosecutor's identification of key factual intervals at which the defendant had an opportunity to premeditate the killings well before firing the gun).

Considering the full statement in light of our precedent, we find the prosecutor's comments were not outside the wide latitude allowed in discussing the law governing the jury's evaluation of the evidence of premeditation. There was no error.

*Zongker's ineffective assistance of counsel argument is not preserved for review.*

Zongker next argues that because trial counsel pursued a guilt-based defense at trial, his Sixth Amendment right to counsel and his right to a jury trial were violated. He argues the proper remedy is for us to reverse his conviction and remand for a new trial.

26

We do not ordinarily address the merits of an ineffective assistance of counsel claim for the first time on appeal. "The usual course is a request by appellate counsel for remand to the district court for an evidentiary hearing on the ineffective assistance claim, commonly called a '*Van Cleave* hearing.'" *Hilyard*, 316 Kan. at 338 (citing *State v. Van Cleave*, 239 Kan. 117, 120, 716 P.2d 580 [1986]). "Although 'there are circumstances when no evidentiary record need be established, when the merit or lack of merit of an ineffectiveness claim about trial counsel is obvious,' and an ineffectiveness claim can therefore be resolved when raised for the first time on appeal, these circumstances are 'extremely rare.'" *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014).

Here, Zongker did not request a remand for a *Van Cleave* hearing on his ineffectiveness claim. When no *Van Cleave* hearing is requested, we need not order one sua sponte. *Hilyard*, 316 Kan. at 338.

Zongker asserts that because he rejected an offer to plead guilty to the charge of second-degree intentional murder, a clear record is established that defense counsel overrode his wishes by pursuing a guilt-based defense. Zongker contends a new trial is the proper remedy, appearing to believe that his case is one of the "extremely rare" times that an ineffectiveness claim can be resolved essentially as a matter of law when raised for the first time on appeal.

Zongker contrasts his case with *Hilyard*. Hilyard asked for a new trial on appeal based on ineffective assistance of counsel simply because the record lacked any evidence that she explicitly consented to the guilt-based defense. This court held that though a defendant must consent to the use of a guilt-based defense, "that consent need not be on the record." 316 Kan. 326, Syl. ¶ 3. Zongker asserts that *Hilyard* is distinguishable because Hilyard actively participated in the guilt-based defense by testifying that she

27

killed the victim. Zongker, on the other hand, did not testify at his trial, and had rejected an offer to plead guilty to second-degree murder before trial. This fact, he now argues, is proof that he did not consent to the guilt-based defense.

The State counters that there may be other reasons Zongker rejected the plea deal, and the factual record is insufficient for the court to review the issue on Zongker's direct appeal. Under the proposed deal, Zongker would have pled guilty to intentional second-degree murder and the parties would agree to an "upward durational departure, essentially to twice the aggravated number in the appropriate grid box, for the maximum penalty allowed by law"; Zongker would also "agree to waive notice for the upward durational departure and his right to a jury trial," and the parties would agree on the aggravating circumstances for the departure. The State therefore asserts that the record is not sufficient for this court, on direct appeal, to conclude that trial counsel went against Zongker's wishes in pursuing the guilt-based defense, because the plea offer would have required Zongker to agree to an upward departure to twice the aggravated number in the grid box for a severity level 1 offense, and, according to the State, would have been agreeing to a sentence of nearly 38 years in prison. Notably, after Zongker was convicted for first-degree murder, defense counsel sought a downward departure to a hard 25 sentence, which the State points to as indicating that Zongker's rejection of the plea offer could have been based on the length of the sentence he would have been forced to accept as a part of the plea deal.

The State's argument is supported by the record. When counsel was discussing the rejected plea deal with the court, the court asked: "Was—that was an agreed State and defense upward durational to twice the high number, not defense free to argue?" The State confirmed that "[d]efense would not have been free to argue, yes. It would have been an agreed upward durational departure." The court followed up by asking if the

issue was "with just the free to argue, or was it something else?" The State said that it "didn't ask," but did note that Zongker "came back and he countered with a separate number," which the State rejected.

Given these facts, we conclude the mere rejection of the plea deal is not sufficient by itself for this court to bypass a *Van Cleave* remand because the record is not "obvious" about the "merit or lack of merit" of Zongker's ineffectiveness claim. *Dull*, 298 Kan. at 839. We decline review because the issue is unpreserved. See *Hilyard*, 316 Kan. at 339 ("Quite simply, a claim of ineffective assistance of counsel for failure to obtain consent for a guilt-based defense must be proved below. It has not been.").

*Cumulative error did not deprive Zongker of a fair trial.*

Cumulative trial errors, when considered together, may require the defendant's conviction to be reversed when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

We have identified three errors where the prosecutor misstated facts: the misstatement of the location of the kill shot, the mischaracterization of Dr. Grinage's testimony, and the erroneous description of the location of the gun. We already concluded that individually, these errors were harmless. We now find that even

considering these errors together, the cumulative effect did not affect the outcome of the trial. The errors were brief and the State presented strong evidence of Zongker's guilt. Cumulative error did not deprive Zongker of a fair trial.

*The district court did not abuse its discretion in declining to impose a departure sentence.*

In Kansas, a sentencing court must order a defendant convicted of first-degree premeditated murder to a hard 50 life sentence unless the judge finds substantial and compelling reasons that support departing to a hard 25. K.S.A. 21-6620(c)(1)(A); K.S.A. 21-6623. We have interpreted the term "substantial" as used in this context to mean "''something that is real, not imagined, and of substance, not ephemeral.'" And a compelling reason "'is one that forces a court—by the case's facts—to abandon the status quo and venture beyond the presumptive sentence.'" [Citations omitted.]" *State v. Galloway*, 316 Kan. 471, 476, 518 P.3d 399 (2022).

K.S.A. 21-6625(a) establishes a nonexclusive list of mitigating circumstances the court may consider. A defendant's psychological state can be a mitigating factor under subsections (a)(2) ("The crime was committed while the defendant was under the influence of extreme mental or emotional disturbances.") and (a)(6) ("The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.").

We review a district court's denial of a departure motion for an abuse of discretion. A district court abuses its discretion when its decision turns on an error of law or fact, its decision is not supported by substantial competent evidence, or its decision is one with which no reasonable person would agree. *Galloway*, 316 Kan. at 476-77.

Zongker argues the district court abused its discretion in failing to impose a downward departure because of his mental illness. He did not present any expert testimony at trial or sentencing to address his mental health issues; rather he simply refers to the pretrial competency evaluation and Dr. Grinage's trial testimony. But as discussed above, Zongker was found competent to stand trial, and Dr. Grinage testified that despite Zongker's mental illness, he was capable of forming an intent to kill.

Zongker also complains that the sentencing court did not make specific findings about why it denied the motion to depart, instead only "perfunctorily not[ing] that 'the motion for departure is denied.'" Zongker seems to suggest that because we do not know why the district court denied the motion, we have to assume the court abused its discretion because the denial was either based on an error of fact (i.e., did not believe Zongker had a mental illness), or an error of law (i.e., did not believe mental illness could be a mitigating factor). And Zongker claims that since he clearly suffers from significant mental illness and because mental illness "can and should be a basis for a mitigated sentence," the district court abused its discretion.

Zongker ignores a third, and much more likely, reason for the court's denial; that it simply did not find substantial and compelling reasons to depart after a review of the mitigating circumstances Zongker offered. The statute does not require the district court to state its reasons for denial; it only requires the district court to state its reasons on the record if it does *not* impose the hard 50. K.S.A. 21-6620(c)(2)(A) ("If the sentencing judge does *not* impose the mandatory minimum term of imprisonment required by K.S.A. 21-6623 . . . the judge *shall state on the record* at the time of sentencing the substantial and compelling reasons therefor . . . ." [Emphases added.]).

And in any event, a review of the district court's full statement reveals that the court did preface its denial with the following:

"Having regard for the nature and the circumstances of the crime, the history, character, and condition of the defendant, the lowest minimum term, which in the opinion of the Court, is consistent with the public safety, the needs of the defendant, and the seriousness of the crimes, the Court makes the following orders:  . . . ."

We have generally upheld denial of departure motions in similar cases. See *State v. Boswell*, 314 Kan. 408, 417, 499 P.3d 1122 (2021); *State v. Grable*, 314 Kan. 337, 342-46, 498 P.3d 737 (2021); *State v. McLinn*, 307 Kan. 307, 347-49, 409 P.3d 1 (2018). We conclude Zongker has failed to establish that the district court abused its discretion by committing a factual or legal error or by making an objectively unreasonable decision, and therefore affirm his hard 50 sentence.

*The district court did not abuse its discretion in failing to sua sponte order a mental evaluation before sentencing.*

K.S.A. 22-3429 provides that "the trial judge may order the defendant committed to the state security hospital for mental examination, evaluation and report." Then, if the report of the examination authorized by K.S.A. 22-3429 shows

"the defendant is in need of psychiatric care and treatment, that such treatment may materially aid in the defendant's rehabilitation and that the defendant and society are not likely to be endangered by permitting the defendant to receive such psychiatric care and treatment, in lieu of confinement or imprisonment, the trial judge shall have power to commit such defendant to:  (1) The state security hospital or any county institution provided for the reception, care, treatment and maintenance of mentally ill persons, if the defendant is convicted of a felony." K.S.A. 22-3430.

Zongker did not request an evaluation under K.S.A. 22-3429. Nevertheless, Zongker now asserts that because he moved for a departure based on his mental illness, the district court was "on notice" and thus abused its discretion by failing to sua sponte order an evaluation. Zongker argues we can reach this issue for the first time on appeal to

prevent the denial of his right to due process. See *Hilyard*, 316 Kan. at 343. We review a district court's decision whether to order an evaluation under K.S.A. 22-3429 for abuse of discretion. *State v. Evans*, 313 Kan. 972, 992, 492 P.3d 418 (2021).

*Evans* and *Hilyard* foreclose Zongker's arguments. In *Evans*, the sentencing court denied Evans' requested mental evaluation under K.S.A. 22-3429 without explanation. Evans asserted the court abused its discretion in doing so, but we disagreed, explaining that:

> "The statutory evaluation scheme is clearly permissive, and it is the defendant's burden to persuade a sentencing court that a mental examination serves the interests of justice. When a party presents no facts and makes no argument to support its request for relief, an issue may be deemed abandoned. . . .

> "Simply asserting that the trial court denied a request does not elevate an issue to the status of preserved for appeal." 313 Kan. at 993.

In other words, though Evans did move for a mental evaluation, because she did not create any further factual record in support of her motion, her motion was not preserved for appeal.

We built on this in *Hilyard*; Hilyard did not request a mental examination, so we concluded she certainly did not "meet her burden to persuade the sentencing court to order [one]. The statute imposes no affirmative duty for courts to raise this issue sua sponte and whether to do so is clearly discretionary. There is no indication the sentencing judge was unaware of this discretion. There is no error." 316 Kan. at 345.

Zongker did not meet his burden of persuading the sentencing court that a mental examination "serves the interests of justice." *Evans*, 313 Kan. at 993. The district court did not abuse its discretion by failing to sua sponte order a discretionary evaluation.

33

*Zongker received an illegal sentence on Count 2.*

A sentence is illegal when it is imposed by a court without jurisdiction, fails to "conform to the applicable statutory provision, either in character or punishment," or "is ambiguous with respect to the time and manner in which it is to be served at the time it is pronounced." K.S.A. 22-3504(c)(1). Whether a sentence is illegal is a question of law subject to unlimited review. *State v. Johnson*, 309 Kan. 992, 997, 441 P.3d 1036 (2019). An illegal sentence may be corrected at any time, and we have the authority to correct an illegal sentence sua sponte. K.S.A. 22-3504(a); 309 Kan. at 997.

At the sentencing hearing, the parties verbally agreed Zongker had a criminal history score of E. Accordingly, the court sentenced Zongker as follows:

"I find the primary crime that controls the base sentence to be Count 2, criminal possession of a weapon. It is a severity level 8 nonperson felony, *placing the defendant in grid box 8-E. Upon those findings, I sentence the defendant to a term of 15 months* in the custody of the Secretary of Corrections. The defendant is entitled to earn up to a maximum of 20 percent good-time credit, and is subject to 12 months of post-release supervision.

. . . .

"On Count 1, murder in the first degree, I'll impose the sentence of life imprisonment with no parole eligibility until 50 years. Counts 1 and 2 are consecutive to each other. Parole supervision in the event of release, is lifetime, and the motion for departure is denied." (Emphasis added.)

The State points out that the journal entry of judgment says that Zongker's criminal history classification is an F. And the presentence investigation report prepared likewise indicates Zongker's criminal history is an F. The criminal history worksheet

34

appears to support this calculation, as it lists two adult nonperson felonies. See K.S.A. 2022 Supp. 21-6804. Accordingly, the journal entry reflects the legal sentence that should have been given; the 15 months orally pronounced at sentencing does not conform to the applicable statutory provision. K.S.A. 2022 Supp. 21-6804. It is well established that "a journal entry is not the controlling pronouncement of a sentence," but rather that a "'criminal sentence is effective upon pronouncement from the bench.'" *State v. Redick*, 317 Kan. 146, 147, 526 P.3d 672 (2023); see also *State v. Juiliano*, 315 Kan. 76, Syl. ¶ 4, 504 P.3d 399 (2022) ("Where the sentence announced from the bench differs from the sentence described in the journal entry, the orally pronounced sentence controls.").

Because the oral pronouncement for 15 months on Count 2 is the controlling sentence—Zongker should have been sentenced in accordance with grid box 8-F, which would have permitted a maximum sentence of 13 months—Zongker received an illegal sentence. Accordingly, we remand for resentencing on Count 2 only. See *State v. Jamerson*, 309 Kan. 211, 216, 433 P.3d 698 (2019).

Conviction affirmed, sentence vacated in part, and case remanded with directions.